PEGGY ANN CREMEANS, *etc.*

*v.*

WILLIAM A. MAYNARD, *et al.*

(No. 13847)

Decided July 11, 1978.

*James Allan Colburn, Baer, Napier & Colburn* for appellant.

*Norman K. Fenstermaker, David C. McCue, Jenkins & Fenstermaker* for Economy Bldg. Systems, Inc.

MCGRAW, JUSTICE:

On March 22, 1973, William Denver Cremeans, along with a number of other union men, was picketing a job site of Economy Building Systems, Inc. (Economy) located in Huntington, West Virginia. There had been trouble at that site the day before, and Economy had a photographer at the scene to record what transpired. At or about 9:00 a.m., brothers Arlie Dale and William Allen Maynard, non-union employees of Economy brought in for the first time from Kentucky, entered the job site. They claimed they had not been informed about the past occurrences or the prospects of confrontation. But, after entering the job site, the two men stepped out of their pickup truck and fired shotguns they had been carrying in their truck. William Denver Cremeans was killed.

This appeal arises from a civil action filed by Peggy Ann Cremeans, the Administratrix of the Estate of William Denver Cremeans, as plaintiff, in the Circuit Court of Cabell County, West Virginia, wherein she sought to recover damages for the alleged wrongful death of her husband who was shot and killed at the construction site.

On or about November 12, 1975, Economy, the employer of the Maynards, filed a Motion for Summary Judgment in the Circuit Court of Cabell County asserting that it was clear from the record, including depositions which were taken of the two Maynard brothers, that neither of the Maynard brothers was acting as agent,

servant or employee within the scope of employment with Economy at the time of the shooting and death of Denver Cremeans.

Following the motion, plaintiff's counsel filed two affidavits in opposition to the motion for summary judgment and, over objection of defense counsel, further filed a transcript of evidence taken at a preliminary hearing in a criminal proceeding arising from the incident. Only selected pages of this transcript has been made available to this Court as part of the record.

The issues raised were submitted to the Court for its decision, and on March 19, 1976, an order was entered granting the motion for summary judgment on behalf of Economy Building Systems, Inc. The plaintiff appealed.

The deposition of the Maynards, upon which the summary judgment was granted, merits detailed review. Prior to March 22, 1973, according to their testimony, Arlie Dale Maynard and William Maynard were employed by Economy Building Systems, Inc. (hereinafter Economy), as laborers and had been working in Berea, Kentucky. Arlie Maynard described a laborer's work as cleaning out water, pumping water out of footers, loading trucks and shoveling ditches, and William Maynard, Arlie's brother, additionally described their work to include picking up wood and other general labor duties.

Arlie Maynard says that he had never acted as a guard for Economy at any time, that Economy did not require him to carry a gun on the job at any time before the shooting incident occurred, and that Economy never required him to carry or bear arms, a billy club, or any kind of instruments of force. William Allen Maynard similarly testified on deposition that he had never worked for Economy as a guard, had never been required at any time during his employment to carry a gun on the job, nor had ever been required to carry arms, a billy club, or anything of that nature.

Both stated that on the day prior to the unfortunate occurrence, Larry Bruce, a foreman of Economy, con-

tacted William Maynard's wife and left a message for them to check into the office in lieu of returning to Berea, Kentucky, where they had been working.

They agreed that on March 22, 1973, following their established practice of checking in with the shop before going out onto a job, they reported to the Economy office in Huntington some time between 8:30 a.m. and 8:45 a.m. Arlie Maynard says that upon arriving at the office he parked his truck, a 1965 or 1966 red and white Ford pickup, 50 or 60 feet from the office itself. According to William Maynard, the guns were not visible in the truck and were placed unloaded and cased behind the seat and on the floor of the truck which had no gun rack.

Both Maynards testified that the guns were in Arlie Maynard's truck because Arlie and his brother, both squirrel hunters, had been hunting or shooting the day before at his brother-in-law's home and that Arlie brought them back in his truck. Sometimes, however, according to William Maynard, they were carried in his truck or were left at his home.

They both said that Larry Bruce, the foreman for Economy, told them that they were to go to a construction site in Huntington where a shopping center was being built and, because block layers were going to be there sometime that day, for them to pump the water out of the footer and off the footer. Maynard said they were to use a gasoline pump located at a tool trailer on the job site to remove the water from the footer, to help mix "mud" (mortar), to carry block in order to assist the bricklayers and blocklayers who were expected to report to work later that day, and to shovel out any dirt that had collapsed in the footers. According to William Maynard, the brothers were at the Economy office for just a "few minutes", long enough to get gasoline for the pump, and to obtain a key to the trailer on the job site where the pump itself would be located.

Arlie Maynard testified that he neither discussed, determined, or otherwise found out at the office that there

had been any labor trouble at the job site to which he was to go; that if there had been trouble at the job site, known by him, he would not have gone over there; that until he was sent there he did not even know that the shopping center job was one being performed by Economy; and, that he had never worked there previously.

William Maynard testified on deposition that he felt he had probably spent one hour at the job site once before, but only to drop off and unload some steel reinforcing bars at a time when there was no labor disturbance; that Larry Bruce, the foreman for Economy, did not mention any labor problems at the office meeting on March 22, 1973; and also that neither Bruce, the foreman, nor any other employees or supervisory personnel of Economy knew that the Maynards had their shotguns in the truck.

Arlie Maynard similarly testified that no one from Economy, including co-employees of Arlie's, knew that he was carrying a gun in the truck on the morning of the accident; that the guns were not taken out, were not flashed, and were not otherwise visible in the truck; that none of the other bosses on any of the other Economy jobs knew that guns were sometimes being carried in Arlie Maynard's truck; and that he had never traded guns with any of the foreman or anybody else at Economy.

After checking in and getting their instructions at the office, the Maynard brothers traveled to the job site in Arlie Maynard's truck, according to William Maynard's deposition.

The Maynards say they traveled north on 14th Street, West, in Huntington, turned left on Madison, and drove into the A & P parking lot where William Maynard purchased some chewing tobacco at the A & P. He indicated that after reentering the truck, they drove across the construction site to within 15 or 20 feet of the storage trailer located on the south side of the construction site, opposite the Heck's store located further to the south. The brothers agreed that the only other individual pres-

ent at the job site for Economy was a laborer named Smith.

Arlie Maynard said the job site was cold and snowy. Both agreed that they arrived there at approximately 9:00 a.m. or 9:05 a.m. William Maynard, who had the key to unlock the trailer where the pump was, got out of the passenger's side of the truck and, according to Arlie, had made it to the steps of the trailer when the brothers first saw a crowd coming at them from about 40 feet away. These people were coming at them from the direction of the Heck's store and from around both the eastern and western sides of the trailer, whereupon they retreated toward their truck according to both brothers.

Arlie Maynard graphically testified as follows:

Q. Had Hecks already been built then?

A. Yes. And there was a big bunch of people over there. And, you know, they always trade knives and guns and everything. I don't know what day they trade now, but they used to about two days a week.

There was a bunch of people there and they run across the street here and come running over to the job site. And some of them had knives, and they were cussing and hollering and telling me and my brother we were dead sons of bitches.

There was a bunch of them come around from the corner this way, come around the trailer here on his side of the truck.

That is when we walked back over to the truck. And they kept coming at us. And we pulled our shotguns out. They just kept right on coming toward us.

According to Arlie, the guns were not removed from the truck until the advancing crowd was 20 feet from the truck. He said he loaded the shotgun with shells he was carrying in his pocket. He says he was fearful that an escape attempt could have failed because of the muddy conditions at the site.

William Maynard was similarly graphic in his description of the approaching group:

A. And these guys started hollering, coming this way. They just started threatening they were going to kill us.

Q. Coming towards what?

A. Towards us, at a fast run or walk, whatever you call it.

\* \* \* \* \*

A. And I started towards the trailer. When they started off the sidewalk I went back to the truck.

It was wet and muddy and slick and we couldn't have gotten out. And they said they were going to kill us. I seen two of them have pocket knives, and they kept their knives open, and they kept on towards us. So I stepped back to the truck and got my shotgun out and I told them I didn't want any trouble.

If they had left I would have left.

But they said 'We are going to get you.' I didn't know what was coming off.

\* \* \* \* \*

A. They just kept on coming towards me. And I got my shotgun out and I told them 'You better back off.' Because they had their knives and they were going to use them on me. And they just kept coming.

Arlie Maynard, the driver of his truck, says he was standing on the driver's side of his truck while his brother, William Maynard, was standing on the passenger's side when the group of 50 or 60 individuals confronted them.

Arlie Maynard says he did not know who the group of men were who were coming toward him; did not know they were union men; and was unaware there was any union problem there on the job site at that time. He admits he had seen individuals standing around Heck's,

but from prior experience believed that these individuals were trading knives as they had done on prior occasions. He says that none of the individuals identified themselves as union people or union organizers. William Maynard says the only individual he recognized in the crowd was a man who worked for the railroad.

The brothers both said that the decedent, William Denver Cremeans, was killed when he confronted William Maynard and grabbed his shotgun by the barrel which discharged. Arlie Maynard says he also fired his shotgun toward the group coming around the east side of the trailer toward him. He says he did not know Cremeans nor had ever seen him at any time prior to the shooting.

Plaintiff's counsel, who participated in the depositions of William A. and Arlie Dale Maynard, filed three pieces of evidence in response to Economy's motion for summary judgment.

The first document filed was an affidavit of the plaintiff, Peggy Ann Cremeans, wherein she says, *inter alia*, that the Maynards were known by everyone to carry firearms in their vehicles; that the company knew or should have known that violence would result and sent a photographer to record the violence which did result; and that the photographer was advised by company officials that there was going to be trouble at the job site on the day of the killing.

The second document filed in opposition to the motion for summary judgment was an affidavit of James W. Ellis, wherein he stated, *inter alia*, that he was a photographer; that he was told that there were pickets on the site and their workers were having trouble; that he was told a fist fight had occurred between workers and pickets at the job site on the previous day; that he was asked to go to the site precisely at 9:00 a.m.; that the company said they were sending two workers to the site at 9:00 a.m. and that he was to capture as many faces as possible and any incident that may take place that day.

The third document filed in this case by plaintiff's counsel was the transcript of a preliminary hearing held before a justice of the peace of Cabell County on April 17, 1973, concerning various warrants then pending against the Maynard brothers arising from the incident in question. Only a portion of this transcript has been reproduced in the official record.

Each of the those subpoenaed to testify at the preliminary hearing indicated that the group of individuals over at Heck's across from the construction site was very substantial in size. The estimates ranged from 20 to 50 persons.

But most who testified at the preliminary hearing gave materially different accounts of what transpired that morning. For example, a picket named Fuller testified this way:

A. These two boys got out of the truck, one on one side and one on the other with a shotgun in their hand.

Q. That was the first time they got out of the truck?

A. They got out of the truck with shotguns in their hand, one on one side and one on the other.

Q. What did they do then?

A. I'd say eight, fifteen foot of them, they shot two men right then, one shot one and one shot the other.

Q. You're sure of that?

A. Definitely, standing looking straight at it, right smack on it.

Q. Eight foot away when they shot?

A. I would say eight foot.

Q. And that's the first time they got out of the truck? They drove up, stopped the truck, got out with their shotguns?

A. Right.

Q. And shot?

A. Then these boys went over and shot them.

Q. Had they been standing there very long?

A. No.

Pickets Woods, Perdue and Adkins similarly agreed that the Maynards entered the job site, parked the truck, and, initially got out of the truck armed with shotguns.

Perdue, who testified that he was shot and injured by Arlie Maynard, further testified as follows:

A. And he [William Maynard] had it [the gun] pointed at me when we first got up there, and I told him "There's no sense in this. It will only cause trouble and there are too many of us; you can't kill us all." About that time Bill Cremeans came up. I didn't know him at the time. He walked up beside of me or some- wheres close—I don't know exactly how close it was—and when he did, he stuck the gun in his gut, and he went to push it away and that's when I heard it go off. When I turned Bill was on his knees, and I was going to run, and that's when the shot hit me.

Picket Elkins similarly recounted the occurrence in this way:

A. And Cremeans told them, said there wasn't no sense to bring no guns on this, and that one over there [William Maynard] turned and shot Cremeans. And I seen this one shoot, but I didn't see who he shot after he was shot. And then they loaded the guns back up and wanted to let us get Cremeans. And we got the other boy, put him in a pickup truck. And that's when the law came.

* * * * *

Q. Mr. Elkins, did you make any threats to ei- ther one of these two defendants?

A. No, I didn't.

Q. Did you hear anyone else make any threats?

A. No.

Q. And I have particular reference to both Mr. Cremeans and Mr. Perdue. Did they make any threats of any kind?

A. No, they didn't.

Picket Beard added this testimony:

A. Well, at first I saw a dark red Ford truck, pickup truck, with a white Kentucky license driving around; and he kept looking over and he was watching the crowd. And then he would go over and park in Heck's parking place and sit there awhile. Then he would drive around. Then later on—I don't know how many times they went down; I didn't keep count of it. Later on this truck came up and the other truck came up, red and white truck, it came up and it parked like this on Madison—I mean Monroe Avenue. And they was there for just a short while and they drove on. The red truck went on. I don't know where it went to, but the red and white one drove down to 15th Street and across and then to A & P parking lot. And then they sat there for awhile, and then they drove across the avenue into the field.

The threshold consideration is set forth in the syllabus of *Porter v. South Penn Oil Co.*, 125 W. Va. 361, 24 S.E.2d 330 (1943):

Before a master can be held liable for an assault upon a third person, committed by his servant, it must be shown that such assault was committed, either by the direction of the master, or in the performance by the servant of duties within the scope of his employment, or in the course of and connected with such employment.

The trial court, upon considering the depositions, affidavit and transcript discussed above, rendered summary

judgment on behalf of Economy apparently concluding that there was no genuine issue of fact, that the Maynards were not acting as agents of Economy, and that the company, as a matter of law, was not responsible for the actions of the Maynards. Appellant submits that there was a "genuine issue of material fact" as to whether the defendant, Economy, should be liable for the actions of the Maynard brothers and that the trial court erred in granting summary judgment.

The leading case in this state on determining the existence of agency and the scope thereof is *Laslo v. Griffith*, 143 W. Va. 469, 102 S.E.2d 894 (1958) wherein the majority rule, *see generally* 53 Am Jur. 2d *Master and Servant* § 460 (1970); 3 C.J.S. *Agency* §§ 546-8 (1973), is set forth as follows in the Court's syllabus:

1. When the facts relied upon to establish the existence of an agency are undisputed, and conflicting inferences can not be drawn from such facts, the question of the existence of the agency is one of law for the court; but if the facts pertaining to the existence of any agency are conflicting or conflicting inferences may be drawn from them, the question of the existence of the agency is one of fact for the jury.

2. When the evidence is conflicting the questions whether the relation of principal and agent existed and, if so, whether the agent acted within the scope of his authority and in behalf of his principal are questions for the jury.

This holding in *Laslo v. Griffith* was based in part upon the earlier case of *Nees v. Goldman Stores, Inc.*, 106 W. Va. 502, 146 S.E. 61 (1928) where the employee of the defendant seriously injured the housewife-plaintiff while trying to collect a debt owed to the defendant. In that case the Court said at 505, 146 S.E. at 62 that "As a general proposition where a declaration otherwise sufficient alleges that a tortious act of an agent was committed in the course of his employment, the verity of that allegation becomes a jury question."

We feel that some material facts pertaining to the agency question, as copiously set forth above, are in sharp conflict and that from them conflicting inference could be drawn. Upon full development of the facts, many of which are disputed, the jury might reasonably infer that the Maynard brothers were acting within the scope of their employment. Such an inference might even be drawn from the undisputed evidence appearing in the record that there had been violence at the job site the day before, that a photographer was hired to photograph any violence that may occur on the day of the killing, that the Maynards were brought in to the site from another job site out of state, that the Maynards had two shotguns in their truck, that Arlie Maynard had shotgun shells in his possession, that violence did occur, that the Maynard brothers fired their shotguns into the group of pickets, and that William Denver Cremeans was killed.

Only in those rare cases where the evidence conclusively shows lack of authority and where conflicting inferences cannot be drawn should the Court decide the issue. Because there are conflicting inferences which can be drawn from the evidence, and since there is disputed evidence, this case must be reversed and remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*