CLIFFIE PORTER *v.* SOUTH PENN OIL COMPANY *et al.*

(No. 9389)

Submitted January 19, 1943. Decided February 16, 1943.

LOVINS, JUDGE, absent.

*W. F. Damron* and *Lilly & Lilly,* for plaintiff in error. *Smith & Smith, Kemble White, Anthony F. McCue* and *Harold M. Garrett,* for defendant in error.

Fox, JUDGE:

On October 25, 1938, Price Montgomery, an employee of the South Penn Oil Company, committed what the evi-

dence discloses to be an unprovoked and vicious assault upon the plaintiff, Cliffie Porter. Porter instituted his action at law in the Circuit Court of Lincoln County against the South Penn Oil Company and Price Montgomery to recover damages resulting from such assault. The case was tried before a jury, and at the completion of the plaintiff's evidence, the defendant, South Penn Oil Company, moved the court to direct a verdict in its favor. This motion was sustained, a verdict returned for said defendant, and judgment entered in its favor. To this action of the court, plaintiff prosecutes this writ of error.

The facts are not in dispute, and it is assumed that the action of the court was based upon its belief that if the case were permitted to go to the jury upon the plaintiff's evidence, the same would not justify a verdict for the plaintiff, and if such a verdict were returned, the same would have to be set aside. This, as we understand, is the proper test of the correctness of the court's action in the premises.

The plaintiff was in possession of two tracts of land which he had leased from the owner, on one or more of which tracts the South Penn Oil Company had drilled wells which were producing either oil or gas. It was necessary to pump the oil wells, and Montgomery was employed by the oil company for that purpose. In going to and from the wells, Montgomery passed through fences between the tracts of land leased by the plaintiff and adjoining properties. At certain points, and at one point in particular, the fence could be opened by laying down the bars or rails that were fastened by wires, and the evidence is that Montgomery's custom was to open up these fences, and pass through without restoring them to their usual position. To use a country expression, "he failed to lay up the bars". The effect of his conduct was to leave open gaps in the fences through which stock could pass and from which damage was likely to result, not only to Porter, but to adjoining landowners. About a week before the assault, the plaintiff met Montgomery, and asked who was going to be responsible for stock getting out, to which Montgomery replied he did not know. The plain-

tiff then stated: "I will go to the South Penn and see. You work for the South Penn, I will go to the South Penn and see who is responsible for it." On the day of the assault, and prior thereto, Montgomery met Forest Porter, a son of the plaintiff, and the son states that Montgomery asked him why his dad was following him around with a shotgun; that he told him that he didn't know that his dad was following him around with a shotgun, and that Montgomery stated that he wanted to know what his (Porter's) dad was mad at him about, and that he told him "he wasn't mad at him in person, he was mad because he was leaving the fence down and letting the cattle get out", and that Montgomery said that "him and the South Penn Oil Company had a right in there, to go any place they wanted to." He further says: "I told him he wasn't mad at him at all, he was mad because that him, that Price Montgomery and the South Penn Oil Company was leaving the fence down causing the cattle to get out. And he called dad a son-of-a-bitch and said he was going to beat his face in. * * *." Chilton Porter, another son of the plaintiff, testified that on one occasion his mother told Price Montgomery "I would like for you to put the fence up when you go up through * * * the cattle is getting out and going on other people's stuff"; he said "To hell with the cattle.*** The South Penn Oil Company has got that up there, and I have got a right to go up there any time I want to, and do anything I want to." And, Mrs. Porter testifying as to the same conversation, states: "I said, 'Mr. Montgomery, I want you to quit leaving fences down and turning our cattle out into everything', and he says, 'To hell with the cattle.' He says, 'Me and the South Penn has got more right in there than you have.' That is what he said back to me." This conversation was some two or three weeks prior to the assault. Immediately preceding the assault Montgomery had been engaged in pumping an oil well located on land occupied by the plaintiff. After completing this particular task, and on leaving the well, he met the plaintiff within a short distance. Very little, if any, conversation passed between them, and without provocation, Montgomery, who was armed with a pistol, used the same

in striking the plaintiff about the head and face, inflicting severe injuries. There is no evidence that the oil company had any knowledge that Montgomery went about his work armed. On the evidence and circumstances outlined above, the plaintiff sought a recovery against the South Penn Oil Company.

It is admitted that at the time of the assault Montgomery was in the employ of the South Penn Oil Company, but it can scarcely be contended that, technically speaking, he was operating within the scope of his employment when he committed the assault in question. Nothing in the evidence indicates that Montgomery was employed for any purpose other than that of looking after the oil and gas wells owned by the oil company. However, an employer cannot always escape liability for an employee's act merely because he was not employed to do that act. The basis of the oil company's liability, if any, must rest upon the question of whether or not the assault was committed in the course of Montgomery's employment. In *Nees* v. *Goldman Stores,* 106 W. Va. 502, 146 S. E. 61, this Court held that "In an action for damages against a master for a tortious act of his servant alleged to have been committed in the course of his employment, wherein facts are alleged which support such allegation, the case thus presented should be submitted to a jury, and, therefore, in such situation, a demurrer should not be sustained on the ground that the act was not committed in the course of employment." That was a case where there was a demurrer to a declaration, and we only cite it to show that the test of whether the master is liable for the act of the servant is sometimes made to depend on whether or not the wrong was committed in the course of his employment. Usually, the term "scope of employment" is used, and the terms are generally regarded as meaning the same thing, although technically there is a distinction.

Our decisions are not entirely clear as to how far a master is liable for an assault committed by his servant. In *Pruitt* v. *Watson,* 103 W. Va. 627, 138 S. E. 331, this Court held that: "An agent can not be said to be acting within

the scope of his agency if the act complained of if done by the master would be unlawful." There is probably no legal distinction between the act of an agent and that of an ordinary employee termed in law a servant. *Mosely* v. *McCrory Co.*, 101 W. Va. 480, 133 S. E. 73, was a case in which there was an arrest of a customer charged with theft of property. It was held that if the arrest was unfounded, there was liability on the part of the employer for the acts of his employee. The holding in *Nees* v. *Goldman Stores, supra,* is to the same effect. In *Cochran* v. *Michaels,* 110 W. Va. 217, 157 S. E. 173, we held that "whether an act by a servant is within the scope of his employment is determined by the relation which the act bears to the employment." And "An act specifically or impliedly directed by the master, or any conduct which is an ordinary and natural incident or result of that act is within the scope of the employment." In *Dilli* v. *Johnson,* 71 App. D. C. 139, 107 Fed. 2d 669, a customer of a restaurant in Washington City asked a waiter for two hamburger sandwiches. One of the sandwiches, when served, was unsatisfactory, and upon the customer asking that it be exchanged, a dispute arose, and the customer was assaulted by the waiter. It was held that the employer was liable for the act of the servant. 35 Am. Juris. 1006, has the following to say: "Formerly, the employer quite generally escaped liability for the consequence of assaults of his employees upon the theory that the acts complained of were outside the scope of employment, even where the action was against a railroad corporation; but the modern tendency is to hold the employer accountable wherever the assault has resulted from a discharge of the duties of the service, although remotely and indirectly connected therewith."

On the whole, we think a correct appraisal of the latest line of authorities warrants a statement to this effect: If an unjustifiable assault is committed by an employee in connection with the performance of work for which he is employed, the employer is liable to the person assaulted. We think, therefore, that if the assault upon the plaintiff had been committed by Montgomery as a result of an

altercation immediately following the conduct of Montgomery with reference to the fences complained of, and in connection therewith, there would have been liability on the oil company. We think that is the limit to which the rule of liability may be extended. No such situation exists here. Plaintiff discussed this matter with Montgomery on one occasion only, at which time complaint was made of his conduct, and the plaintiff indicated that he would take up the matter with the oil company. Montgomery was evidently incensed at plaintiff's attitude, and it became his personal grievance. He was highly incensed toward the plaintiff in the morning of the day of the assault, and made threats against the plaintiff—said he was "going to beat his face in". We think he was acting solely for himself in pursuance of a personal grudge, and that his conduct was wholly divorced from his employment by the oil company. Apparently, he resented plaintiff's threat to report his conduct to his employer, and the fact that he went to plaintiff's premises armed with a deadly weapon indicates his frame of mind. On the other hand, it cannot be assumed that the oil company was interested in the suppression of any complaints which might be made against its employee. A more reasonable assumption would be that if its employee was violating the rights of others, it would welcome a report, first, in its own interest, to escape liability for the acts of its employee; and, second, because no profit is ever gained by any one in incurring public or private resentment. We think, therefore, that Montgomery's acts in committing this assault grew out of his personal grievance, real or assumed, with which, by no reasonable rule of law, can the South Penn Oil Company be connected.

Therefore, we hold that the actions of the circuit court in directing the jury to return a verdict for the South Penn Oil Company, and entering judgment thereon, were proper, and the judgment entered by it is affirmed.

*Affirmed.*