504 S.E.2d 419

**Charles TRAVIS, Plaintiff below,**

v.

**ALCON LABORATORIES, INC., Defendant below.**

No. 24207.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 14, 1998.

Decided May 21, 1998.

372

Joseph M. Farrell, Jr., Farrell, Farrell, and Farrell, Huntington, for Plaintiff.

Charles M. Surber, Jr., Erin Magee Condaras, Jackson and Kelly, Charleston, for Defendant.

STARCHER, Justice:

■ This case is before this Court upon four certified questions[1] from the United States District Court for the Southern District of West Virginia at Huntington. The plaintiff in the federal court lawsuit, Charles Travis, alleges that he was constructively discharged[2] from his job with the defendant, Alcon Laboratories, Inc. ("Alcon"). The plaintiff claims that the termination was caused by the intentional or reckless infliction of emotional distress by outrageous conduct by the plaintiff's supervisor. The plaintiff also claims that defendant Alcon knew of the supervisor's conduct, but failed to remedy the situation.

The questions from the District Court concern the elements of a cause of action for intentional or reckless infliction of emotional distress by outrageous conduct, and whether an employer may be held liable for a supervisor's outrageous conduct towards a subordinate employee. We are also asked to determine when the statute of limitation begins to run for an action against an employer for the intentional or reckless infliction of emotional distress. Lastly, we are asked whether the West Virginia Human Rights Act, *W.Va.Code*, 5–11–1 to –19, forms the basis for establishing a public policy protecting all persons from harassing conduct, for purposes of West Virginia wrongful discharge law.

## I.

### *Factual Background*

The plaintiff was employed by defendant Alcon (and its predecessor) from 1981 until 1994. The plaintiff was hired in 1981 by Cilco, a corporate predecessor of defendant Alcon, as a machine repairman. Between 1981 and 1986, the plaintiff's work was overseen by Jim Richards ("Richards"), the facility maintenance supervisor.[3]

In 1986, Richards was laid off by Cilco and the plaintiff was appointed as the acting facility maintenance supervisor. He was promoted to that position permanently in 1987. As the facility maintenance supervisor, the plaintiff was responsible for keeping the plant clean and functioning, and for supervising a staff of six mechanics and six custodians.

In 1990 defendant Alcon purchased the Cilco facility. At that time Richards was rehired by Alcon, and Richards again became the plaintiff's supervisor. The plaintiff, however, retained his position as facility maintenance supervisor.

The plaintiff alleges that at some point in 1990, Richards told the plaintiff that he blamed the plaintiff for being at least partly responsible for Richards' termination in 1986. Richards allegedly told the plaintiff that he would "get even" for his 1986 layoff. The plaintiff claims that he tried unsuccessfully to convince Richards that he had nothing to do with Richards being laid off.

The plaintiff contends that after Richards' 1990 rehiring, Richards would often countermand the job assignments that the plaintiff gave to his staff. Richards allegedly would also often criticize and belittle the plaintiff in an angry tone of voice in front of other

1. *See* West Virginia Uniform Certification of Questions of Law Act, *W.Va.Code*, 51–1A–1 to –13 [1996].

2. "In order to prove a constructive discharge, a plaintiff must establish that working conditions created by or known to the employer were so intolerable that a reasonable person would be compelled to quit. It is not necessary, however, that a plaintiff prove that the employer's actions were taken with a specific intent to cause the plaintiff to quit." Syllabus Point 6, *Slack v. Kanawha County Housing and Redevelopment Auth.*, 188 W.Va. 144, 423 S.E.2d 547 (1992).

3. Although Richards' conduct is partly at issue, he is not a party to this action.

employees using abusive and profane language. The plaintiff (and other employees) complained to upper management that Richards treated them in a demeaning manner.

The plaintiff alleges that he spoke with Sandra Sexton (the human resources director for defendant Alcon) and Ralph Stearman (the supervisor of both the plaintiff and Richards) several times in an effort to get them to put a stop to what the plaintiff considered to be Richards' harassment. In his conversations with Ms. Sexton, the plaintiff would become emotionally upset and cry. Ms. Sexton testified in a deposition that she considered Richards to be "uncooperative, defensive and argumentative," and that Richards' demeaning treatment of subordinates was his typical style of management.

The record suggests that Ms. Sexton also spoke with Mr. Stearman three or four times regarding Richards' conduct; Mr. Stearman's response was to tell Richards to approach people differently, by getting them isolated and behind closed doors before reprimanding them, rather than doing so in public and in front of other employees. A memo in the plaintiff's file written by Richards records one such conversation with Mr. Stearman, and states, "I was told by Ralph [Stearman] to very gently get [plaintiff] Travis behind closed doors and chew his ass good." The plaintiff alleges Richards frequently "chewed him out" because of Richards' purported dissatisfaction with the plaintiff's job performance. No disciplinary or corrective action was ever taken by defendant Alcon against Richards.

In 1993, Richards assumed direct supervision of the mechanics at the plant, including the mechanics under the plaintiff's control.

The plaintiff told Stearman that he could not tolerate Richards' conduct any longer, and asked to be put under someone else's supervision. The plaintiff was placed under the supervision of Joseph Bragg in January 1994, and it was the plaintiff's opinion that things improved dramatically.

When the plaintiff returned from a vacation in April 1994, he learned that he had once again been placed under Richards' supervision. In addition, Richards had assumed direct control of the custodial staff, leaving the plaintiff with no employees under his supervision. The plaintiff asked Ms. Sexton if there was any way that he could get away from Richards. The plaintiff even offered to take a demotion to any other job in order to get away. Ms. Sexton advised the plaintiff to take another week of vacation to allow her to investigate the possibility of making a change in the situation. However, she was unable to persuade defendant Alcon's managers to make any change. The plaintiff claims that he then asked the general manager for Alcon, Mr. Camp, to intercede—but he refused. The plaintiff then quit his job.

In this action against defendant Alcon, the plaintiff takes the position that Richards intentionally and/or recklessly inflicted emotional distress upon him, in retaliation for the plaintiff's perceived role in Richards' 1986 lay-off. The plaintiff further takes the position that Alcon's upper management did not intervene in the conflict because they, too, wanted to get rid of the plaintiff. The plaintiff contends that Alcon assisted Richards in his abusive techniques, encouraging Richards to abuse the plaintiff behind closed doors rather than in public.[4]

---

4. In the instant case the plaintiff alleges that his supervisor engaged in outrageous conduct over a four-year period that culminated in his constructive discharge. This is distinguishable from cases where the plaintiff alleges outrageous conduct in the discharge process.

In *Dzinglski v. Weirton Steel Corp.*, 191 W.Va. 278, 445 S.E.2d 219 (1994), we discussed the manner of distinguishing a wrongful discharge claim from a claim for the outrageous or reckless infliction of emotional distress, when both causes of action arise from the manner in which the plaintiff was discharged from employment. We stated in Syllabus Point 2:

The prevailing rule in distinguishing a wrongful discharge claim from an outrage claim is this: when the employee's distress results from the fact of his discharge—e.g., the embarrassment and financial loss stemming from the plaintiff's firing—rather than from any improper conduct on the part of the employer in effecting the discharge, then no claim for intentional infliction of emotional distress can attach. When, however, the employee's distress results from the outrageous manner by which the employer effected the discharge, the employee may recover under the tort of outrage. In other words, the wrongful discharge action depends solely on

374

Conversely, defendant Alcon takes the position that the plaintiff could not competently handle his job, and that he quit because he did not want to do things the way Richards told him. The defendant, in oral argument before this Court, characterized the plaintiff's evidence as merely proof of a personality conflict between Richards and the plaintiff. Richards, in his deposition testimony, denied that he mistreated the plaintiff in any way in an effort to force him to quit his job.

## II.

### Questions Certified by the District Court

The questions certified to this Court by the District Court are as follows:

1. Does a supervisor's repeated behavior toward a particular employee over a four-year period, which is motivated by that supervisor's personal animosity against that employee and which the employee considers creates an intolerable work environment, constitute outrageous conduct if the supervisor's actions consist of (a) criticizing that employee in harsh, abusive, and sometimes profane, language, often while in the presence of other employees; (b) interfering with that employee's supervision of others by countermanding his instructions; (c) threatening to get that employee fired?

2. Would that employee have a cause of action against his employer for the tort of intentional infliction of emotional distress based upon the employer's failure to put a stop to the supervisor's conduct, despite repeated requests by the employee?

3. If the employer may be held so liable, when does the employee's cause of action accrue?

4. Does the supervisor's conduct violate a substantial public policy of the State of West Virginia, particularly as expressed in the Human Rights Act, W.Va.Code § 5–11–2, so as to give rise to a cause of action by the employee against his employer for constructive discharge or retaliatory discharge, even though the employee is not a

the validity of the employer's motivation or reason for the discharge. Therefore, any other conduct that surrounds the dismissal must be

member of any of the protected groups enumerated in § 5–11–2?

## III.

### Discussion

■ This Court is empowered to answer any question certified to it from the federal courts or other state appellate courts if the answer may be determinative of an issue in a pending cause in the certifying court, and if there is no controlling appellate decision, constitutional provision or statute of this State. See W.Va.Code, 51–1A–3 [1996]. However, when a certified question is framed so that this Court is not able to fully address the law which is involved in the question, then this Court retains the power to reformulate the questions certified to it under the Uniform Certification of Questions of Law Act, W.Va.Code, 51–1A–1 to –13 [1996]. Syllabus Point 3, Kincaid v. Mangum, 189 W.Va. 404, 432 S.E.2d 74 (1993).

### A. Intentional or Reckless Infliction of Emotional Distress

At the outset we note that the first question certified by the District Court is set forth in a fact-laden manner. Accordingly, to ensure the consistent application of our case law, we believe a simpler question should be answered: What are the elements of a cause of action for the intentional or reckless infliction of emotional distress?

■ Intentional or reckless infliction of emotional distress, also called the "tort of outrage," is recognized in West Virginia as a separate cause of action. We discussed this cause of action in Syllabus Point 6 of Harless v. First Nat. Bank in Fairmont, 169 W.Va. 673, 289 S.E.2d 692 (1982), where we stated:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

weighed to determine whether the employer's manner of effecting the discharge was outrageous.

This formulation of the cause of action is identical to that which is contained in the *Restatement of Torts (Second)*, § 46(1) [1965].

In our jurisprudence on the tort of outrage we have never plainly stated the elements that a plaintiff is required to prove in order to prevail on a claim. However, Justice Cleckley discussed the definition of outrage and suggested a four-part formulation of the tort in his concurrence in *Hines v. Hills Department Stores, Inc.*, 193 W.Va. 91, 454 S.E.2d 385, (1994) (*per curiam*). Justice Cleckley stated:

> The four elements of the tort can be summarized as: (1) conduct by the defendant which is atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible bounds of decency; (2) the defendant acted with intent to inflict emotional distress or acted recklessly when it was certain or substantially certain such distress would result from his conduct; (3) the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

193 W.Va. at 98, 454 S.E.2d at 392. *See also, Harless,* 169 W.Va. at 694–95, 289 S.E.2d at 704 (*quoting Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E.2d 145, 148 (1974)). We have examined Justice Cleckley's discussion in light of our holding in *Harless, supra,* and *Restatement of Torts (Second)*, § 46(1) [1965], and find this four-factor test to be an appropriate requirement for a plaintiff to successfully prove a claim for the tort of outrage.

■ Accordingly, we hold that in order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

■ The first element of the cause of action is a showing by the plaintiff that the defendant's actions towards the plaintiff were atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency. The defendant's conduct "must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct." *Grandchamp v. United Air Lines, Inc.*, 854 F.2d 381, 383 (10th Cir.1988).

We discussed the type of conduct by a defendant that a plaintiff must show to prove "outrageousness" in *Tanner v. Rite Aid of West Virginia, Inc.*, 194 W.Va. 643, 461 S.E.2d 149 (1995). Quoting from the comments to *Restatement of Torts (Second)*, § 46, we stated:

> d. Extreme and outrageous conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough lan-

guage, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

194 W.Va. at 650–51, 461 S.E.2d at 156–57.

■ The defendant's knowledge that a plaintiff is particularly susceptible to emotional distress somewhat alters the above standards for determining whether conduct is "extreme and outrageous." According to the comments to § 46 of the *Restatement:*

The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some ... mental condition. The conduct may become heartless, flagrant, and outra-

geous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.

*Restatement of Torts (Second)*, § 46, comment (f) [1965].[5]

■ In determining whether a defendant's conduct is "extreme and outrageous," a finder of fact may consider whether the extreme and outrageous character of the conduct arose from an abuse by the defendant of a position or relationship to the plaintiff, which gave the defendant actual or apparent authority over the plaintiff or power to affect the plaintiff's interests. *Restatement of Torts (Second)*, § 46, comment (e) [1965]. "[T]he existence of a special relationship in which one person has control over another, as in the employer-employee relationship, may produce a character of outrageousness that otherwise might not exist." *Bridges v. Winn–Dixie Atlanta, Inc.*, 176 Ga.App. 227, 230, 335 S.E.2d 445, 448 (1985).[6]

**5.** An example of a susceptible plaintiff in the employment context is *Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984). In *Tandy Corp.*, the court held that a plaintiff-employee presented sufficient evidence of intentional infliction of emotional distress when he alleged investigators working for his employer interrogated the plaintiff under stressful circumstances, demanded that the plaintiff take a polygraph test, and refused on three occasions to allow the plaintiff to take his medication, the tranquilizer Valium. The court held that this was not a situation of a plaintiff of ordinary emotional stamina, nor a situation in which the defendant was totally ignorant of the physical or emotional condition of the plaintiff. Under these circumstances, it was for the jury to decide whether the employer and its investigators engaged in outrageous conduct.

**6.** The Court in *Bodewig v. K–Mart, Inc.*, 54 Or. App. 480, 486, 635 P.2d 657, 661 (1981) noted the "special relationship" between an employer and employee, stating that "[a]n employer has ... authority over an employee, who, by the nature of the relationship, is subject to the direction and control of the employer and may be discharged for any or no reason.... Clearly, that relationship is not an arm's length one between strangers."

Similarly, the Georgia Court of Appeals stated that:

The workplace is not a free zone in which the duty not to engage in wilfully and wantonly causing emotional distress through the use of abusive or obscene language does not exist. Actually, by its very nature, it provides an

environment more prone to such occurrences because it provides a captive victim who may fear reprisal for complaining, so that the injury is exacerbated by repetition, and it presents a hierarchy of structured relationships which cannot easily be avoided. The opportunity for commission of the tort is more frequently presented in the workplace than in casual circumstances involving temporary relationships.

*Coleman v. Housing Auth. of Americus*, 191 Ga. App. 166, 169, 381 S.E.2d 303, 306 (1989).

There are numerous cases where the outrageous conduct of a supervisor has led to the liability of an employer for an employee's emotional distress. *See, e.g., Subbe–Hirt v. Baccigalupi*, 94 F.3d 111, 113 (3d Cir.1996) (supervisor repeatedly used abusive and humiliating tactics, including "intense and emotionally painful sessions in which he would berate and demean" the plaintiff through a process nicknamed "root canal," to force the plaintiff to "either go out on disability or leave the company or to cease the union activity...."); *Lightning v. Roadway Express, Inc.*, 60 F.3d 1551 (11th Cir.1995) (supervisors subjected plaintiff-employee to verbal abuse on numerous occasions; "chewed out" the plaintiff; stated they were "going to get" the plaintiff; undertook a strategy to have the plaintiff "written up" as much as possible to persuade the plaintiff to quit, a process called "mad-dogging;" and once spat on and assaulted the plaintiff); *Otterbacher v. Northwestern University*, 838 F.Supp. 1256 (N.D.Ill.1993) (over a period of months, female supervisor harassed male plaintiff and made vulgar, insulting, and abusive phone calls to plaintiff's residence, before and after employment terminated); *Johnson v. Feder-*

The employer-employee relationship should entitle an employee to "a greater degree of protection from insult and outrage than if he were a stranger to defendants." *Alcorn v. Anbro Engineering, Inc.*, 2 Cal.3d 493, 498 n. 2, 86 Cal.Rptr. 88, 90 n. 2, 468 P.2d 216, 218 n. 2 (1970). *See also, Blong v. Snyder*, 361 N.W.2d 312, 316 (Iowa App.1984); *Hall v. May Dept. Stores Co.*, 292 Or. 131, 138, 637 P.2d 126, 131 (1981).

The *Restatement* also suggests that trial courts should first examine the proof presented by the plaintiff to determine if the defendant's conduct may legally be considered "extreme and outrageous." It states:

> h. Court and jury. It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

*Restatement of Torts (Second)*, § 46, comment (h) [1965].

We do not believe that our recognition of the tort of intentional or reckless infliction of emotional distress has in any way altered a trial court's role in the examination of the sufficiency of evidence in a motion for summary judgment. Under Rule 56(c) of the *West Virginia Rules of Civil Procedure*, the facts are to be construed in a light most favorable to the non-moving party, and summary judgment is proper only where the moving party shows that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Painter v. Peavy*, 192 W.Va. 189, 192, 451 S.E.2d 755, 758 (1994). "The circuit court's function at the summary judgment stage is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.,* Syllabus Point 2. "Summary judgment should be denied 'even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom.'" *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 59, 459 S.E.2d 329, 336 (1995), *quoting Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.), *cert. denied*, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951).

As Justice Cleckley stated in his concurrence in *Hines v. Hills Dept. Stores, Inc., supra*, in the area of intentional or reckless infliction of emotional distress:

> The role of both the trial court and appellate court is limited to determining whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. If reasonable persons could differ on the issue, the question is one for the jury. What, too often, is overlooked ... is the distinct difference

al Reserve Bank of Chicago, 199 Ill.App.3d 427, 145 Ill.Dec. 558, 557 N.E.2d 328 (1990) (plaintiff's supervisors engaged in a pattern of abusive conduct for two years in retaliation for plaintiff's disclosure of improper banking practices to auditors, and continuing after plaintiff notified his supervisors of his susceptibility to emotional distress); *Bodewig v. K–Mart, Inc., supra* (employer could be liable for outrageous conduct when male supervisor forced plaintiff, a female cashier, to submit to strip search to satisfy customer that plaintiff did not steal customer's money); *Contreras v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 565 P.2d 1173 (1977) (supervisors failed to keep plaintiff's co-workers from wrongfully accusing plaintiff of theft of company property, and allowed co-workers to use racial epithets towards plaintiff, before and after employment terminated); *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315 (1976) (plaintiff-waitress stated cause of action when supervisor, while investigating theft by unknown persons, announced during meeting that until the person responsible for theft was revealed, supervisor would begin firing all the present waitresses in alphabetical order; plaintiff was fired first); *Alcorn v. Anbro Engineering, Inc.*, 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216 (1970) (after plaintiff presented several union grievances to supervisor, supervisor responded by hurling racial epithets at plaintiff and telling plaintiff he was fired; plaintiff reported incident to upper management, and upper management ratified supervisor's conduct by firing plaintiff). *Cf. Harris v. Jones*, [281 Md. 560] 380 A.2d 611 (App.1977) (General Motors supervisor regularly mocked employee's stuttering and nervousness; court found supervisor's conduct was extreme and outrageous, but found insufficient evidence that the conduct caused plaintiff to suffer extreme distress). *See generally*, "Liability of Employer, Supervisor, or Manager for Intentionally or Recklessly Causing Employee Emotional Distress," 52 A.L.R.4th 853 (1987).

between determining whether conduct may reasonably be considered outrageous, a legal question, and whether conduct is in fact outrageous, a question for jury determination.

193 W.Va. at 98, 454 S.E.2d at 392 (Cleckley, J., concurring) (citation omitted).

■ We therefore hold that in evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination.

When evaluating whether reasonable persons could differ on the outrageousness of certain conduct, courts should keep in mind that "[c]hanging sensitivity in society alters the acceptability of former terms ... It is for the trier of fact to determine, taking into account changing social conditions and plaintiff's own susceptibility, whether the particular conduct was sufficient to constitute extreme outrage." *Contreras v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 565 P.2d 1173, 1177 (1977).[7]

■ The second element that a plaintiff must show is that the defendant acted with an intent to inflict emotional distress upon the plaintiff, or acted in a reckless manner such that it was certain or substantially certain that emotional distress would result from the defendant's actions. Comment (i) to § 46 of the *Restatement of Torts (Second)* states:

> The rule stated in this Section applies where the actor desires to inflict severe

---

7. In *Contreras v. Crown Zellerbach Corp.*, the Washington Supreme Court was asked to address whether the use of slang-epithets by co-workers to describe a plaintiff of Mexican–American lineage constituted outrageous conduct. The court noted that while such terms "may once have been in common usage," today it is appropriate for the trier of fact to determine whether such terms are more than "mere insulting language." 565 P.2d at 1177.

Similarly, in *Alcorn v. Anbro Engineering, Inc.*, [2 Cal.3d 493] 86 Cal.Rptr. 88, 468 P.2d 216 (1970), the California Supreme Court held that the use of epithets and profanity by a supervisor towards the African–American plaintiff supported a claim of intentional infliction of emotional distress against the employer. The court stated:

> Although the slang epithet "nigger" may once have been in common usage, along with such other racial characterizations as "wop," "chink," "jap," "bohunk," or "shanty Irish," the former expression has become particularly abusive and insulting in light of recent developments in the civil rights' movement as it pertains to the American Negro. Nor can we accept defendants' contention that plaintiff, as a truckdriver[,] must have become accustomed to such abusive language. Plaintiff's own susceptibility to racial slurs and other discriminatory conduct is a question for the trier of fact, and cannot be determined on demurrer.

86 Cal.Rptr. at 91 n. 4, [86 Cal.Rptr. at 91 n. 4] 468 P.2d at 219 n. 4.

An example of developing social mores is found in a comment by Professor Magruder, one of the drafters of the *Restatement of Torts*. Professor Magruder wrote in 1936 that women were usually unsuccessful in seeking damages for mental distress and humiliation "on account of being addressed by a proposal of illicit intercourse ... the view being, apparently, that there is no harm in asking." Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv.L.Rev. 1033, 1055 (1936).

Sixty-two years later, the Court of Appeals for the Second Circuit discussed the difficulty arising from a federal judge evaluating whether conduct by a defendant amounts to sexual harassment, stating:

> Today, while gender relations in the workplace are rapidly evolving, and views of what is appropriate behavior are diverse and shifting, a jury made up of a cross-section of our heterogenous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment and retaliation.
>
> The factual issues in this case cannot be effectively settled by a decision of an Article III judge on summary judgment. Whatever the early life of a federal judge, she or he usually lives in a narrow segment of the enormously broad American socio-economic spectrum, generally lacking the current real-life experience required in interpreting subtle sexual dynamics of the workplace based on nuances, subtle perceptions, and implicit communications.

*Gallagher v. Delaney*, 139 F.3d 338, 347 (2d. Cir.1998). In reversing the district court's granting of summary judgment to the defendant, the Court of Appeals held that "[a]n Article III judge is not a hierophant of social graces. Evaluation of ambiguous acts such as those revealed by the potential evidence in this case presents an issue for the jury." *Id.* at 347.

emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It also applies where he acts recklessly, . . . in deliberate disregard of a high degree of probability that the emotional distress will follow.

Whether a defendant has acted intentionally or recklessly in inflicting emotional distress is usually a question of fact for the jury. *See, e.g.,* Syllabus Point 8, *Skaggs v. Elk Run Coal Co.,* 198 W.Va. 51, 479 S.E.2d 561 (1996) (in civil rights cases, jury may consider inferences in determining intent and causation); *Jolynne Corp. v. Michels,* 191 W.Va. 406, 414, 446 S.E.2d 494, 502 (1994) (in a claim of lease abandonment, "[T]he element of intent usually presents a disputed factual question. . . ."); *Berry v. Nationwide Mut. Fire Ins. Co.,* 181 W.Va. 168, 176, 381 S.E.2d 367, 375 (1989) (relying on *Hayseeds, Inc. v. State Farm Fire & Cas.,* 177 W.Va. 323, 330–31, 352 S.E.2d 73, 80–81 (1986), jury question was presented on whether defendant acted willfully, maliciously and intentionally); *Mooney v. Eastern Associated Coal Corp.,* 174 W.Va. 350, 352, 326 S.E.2d 427, 429 (1984) (in action under *W.Va.Code,* 23–4–2, when reasonable minds could differ on whether the defendant acted with deliberate intent, the issue is properly presented to the jury).

■ The third element encompasses the requirement of causation. The plaintiff must show that the defendant's extreme and outrageous conduct caused the plaintiff to suffer severe emotional distress. The requirement of causation is satisfied by showing a "logical sequence of cause and effect" between the actions of the defendant and the plaintiff's injury. *Long v. City of Weirton,* 158 W.Va.

741, 761, 214 S.E.2d 832, 848 (1975). When the defendant's conduct is "extreme and outrageous . . . it is more likely that the severe emotional distress suffered by the victim was actually caused by the perpetrator's misconduct rather than by another source." *Hakkila v. Hakkila,* 112 N.M. 172, 176, 812 P.2d 1320, 1324 (App.1991).

■ Expert testimony is not required in every case to prove the causation element for intentional infliction of emotional distress. As we stated in Syllabus Point 4 of *Tanner v. Rite Aid of West Virginia,* 194 W.Va. 643, 461 S.E.2d 149 (1995):

We do not adopt a bright-line rule that expert testimony is never required to prove the tort of outrage. Although expert testimony may be a helpful and effective method of proving emotional distress and its relationship to the act complained of, it is not always necessary. A determination by the trial court as to whether a plaintiff has presented sufficient evidence, absent expert testimony, such that the jury from its own experience can evaluate the claim, its causal connection to the defendant's conduct and the damages flowing therefrom will not be disturbed unless it is an abuse of discretion.

*See also, Poole v. Copland, Inc.,* 125 N.C.App. 235, 481 S.E.2d 88 (1997) (expert testimony that sexual harassment "could" or "might" have triggered plaintiff-employee's severe emotional distress was sufficient to take the causation issue to the jury, and precluded a directed verdict or judgment notwithstanding the verdict for the defendant-employer).[8]

---

8. In *Dzinglski v. Weirton Steel Corp., supra,* we suggested that where damages are awarded for emotional distress without proof of physical trauma, such damages serve, in part, the policy of deterrence that also underlies punitive damages. Hence, a plaintiff receiving a jury award of both types of damages has received an impermissible double-recovery.

We clarified our holding in *Dzinglski* in *Tudor v. Charleston Area Medical Center,* —— W.Va. ——, 506 S.E.2d 554 (No. 23948 December 16, 1997) and suggested that in order for a plaintiff to recover both compensatory damages and punitive damages in an intentional or reckless infliction of emotional distress claim, expert testimony

should be used to establish the extent of the plaintiff's emotional injury. We stated at Syllabus Points 14 and 15:

14. In cases where the jury is presented with an intentional infliction of emotional distress claim, without physical trauma or without concomitant medical or psychiatric proof of emotional or mental trauma, i.e. the plaintiff fails to exhibit either a serious physical or mental condition requiring medical treatment, psychiatric treatment, counseling or the like, any damages awarded by the jury for intentional infliction of emotional distress under these circumstances necessarily encompass punitive damages and, therefore, an additional award for punitive damages would constitute

Lastly, there must be a showing that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. Severe emotional distress includes (but is not limited to) such reactions as mental suffering and anguish, shock, fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. However,

> [i]t is only where [the emotional distress] is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it.

*Restatement of Torts (Second)*, § 46, comment (j) [1965]. The finder of fact may consider the intensity and duration of the duress in determining its severity. "Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." *Id.* The reasonableness of the plaintiff's reaction will normally be a jury question. *Heldreth v. Marrs*, 188 W.Va. 481, 491, 425 S.E.2d 157, 167 (1992).

As previously noted, the first question formulated by the District Court was very fact-dependent. The question generally asked whether (a) criticism of an employee in harsh, abusive and sometimes profane language, (b) interfering with that employee's supervision of other employees, and (c)

threatening the employee with being fired—constitutes outrageous conduct. We believe that by·rephrasing the question so as to enunciate the elements of a cause of action for the intentional or reckless infliction of emotional distress we have established guidelines by which courts and juries may evaluate these claims.

### B. *The Employer's Liability for Outrageous Conduct*

The second question proffered by the District Court is: "Would that employee have a cause of action against his employer for the tort of intentional or reckless infliction of emotional distress based upon the employer's failure to put a stop to the supervisor's conduct, despite repeated requests by the employee?" As with the District Court's first question, the question is fact-specific, and requires reformulation to make our decision more generally applicable.

Upon close examination, we believe that there are two legal issues within the District Court's second question. These issues are: (1) may an employer be held responsible for a supervisor's outrageous actions; and (2) can an employer be liable for intentional or reckless infliction of emotional distress for refusing to stop a supervisor's outrageous conduct? We believe that both parts of the question should be answered in the affirmative.

The first issue we discuss is whether an employer can be held liable for emotional distress intentionally or recklessly inflicted by a supervisor. The general rule is that an

an impermissible double recovery. Where, however, the jury is presented with substantial and concrete evidence of a plaintiff's serious physical, emotional or psychiatric injury arising out of the intentional infliction of emotional distress, i.e. treatment for physical problems, depression, anxiety, or other emotional or mental problems, then any compensatory or special damages awarded would be in the nature of compensation to the injured plaintiff(s) for actual injury, rather than serving the function of punishing the defendant(s) and deterring such future conduct, a punitive damage award in such cases would not constitute an impermissible double recovery. To the extent that this holding conflicts with our decision in *Dzinglski v. Weirton Steel Corp.*, 191 W.Va. 278, 445 S.E.2d 219 (1994), it is hereby modified.

15. Where a jury verdict encompasses damages for intentional infliction of emotional distress, absent physical trauma, as well as for punitive damages, it is incumbent upon the circuit court to review such jury verdicts closely and to determine whether all or a portion of the damages awarded by the jury for intentional infliction of emotional distress are duplicative of punitive damages such that some or all of an additional award for punitive damages would constitute an impermissible double recovery. If the circuit court determines that an impermissible double recovery has been awarded, it shall be the court's responsibility to correct the verdict.

employer is responsible for the all of the acts of its agents or employees that are done within the course and scope of their employment. Individual agents or employees may also be held individually responsible for their acts done within the course and scope of their employment.

██ We stated in Syllabus Point 3 of *Musgrove v. Hickory Inn, Inc.*, 168 W.Va. 65, 281 S.E.2d 499 (1981) that:

An agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or employee relationship. Of course, if he is acting within the scope of his employment, then his principal or employer may also be held liable.

Generally, the course and scope of employment includes any conduct by an officer, agent or employee in the furtherance of the employer's business.

We have generally accepted the proposition that an employer may be liable for the conduct of an employee, even if the specific conduct is unauthorized or contrary to express orders, so long as the employee is acting within his general authority and for the benefit of the employer. For example, in *Nees v. Julian Goldman Stores, Inc.*, 106 W.Va. 502, 146 S.E. 61 (1928), we concluded that an employee of the defendant was within the scope of his employment when he seriously injured the housewife-plaintiff in a "violent altercation" while trying to collect a debt owed to the defendant. We stated that:

A master may not limit his liability to such of the conduct of his servant as is discreet and within the bounds of propriety, and avoid liability as to such conduct as is indiscreet and improper. Where a master sends forth an agent he is responsible for the acts of his agent within the apparent scope of his authority, though the agent oversteps the strict line of his duty.

106 W.Va. at 505, 146 S.E. at 62. *See also, Cremeans v. Maynard*, 162 W.Va. 74, 246 S.E.2d 253 (1978) (question of fact presented as to whether out-of-state workers brought to job site by employer were within the scope of employment in firing shotguns at union picketers); *Porter v. South Penn Oil Co.*, 125 W.Va. 361, 24 S.E.2d 330 (1943) (an employer may be liable for an assault committed by an employee acting in the performance of duties within the scope of the employment); *Meadows v. Corinne Coal & Land Co.*, 115 W.Va. 522, 177 S.E. 281 (1934) (employer was liable for malicious prosecution initiated against plaintiff by employee acting within the scope of his employment and in furtherance of the employer's business); *Fetty v. Huntington Loan Co.*, 70 W.Va. 688, 74 S.E. 956 (1912) (same). Hence, intentional or reckless acts of an employee or supervisor may be imputed to the employer, if those acts were committed within the scope of employment.

██ The second issue posed by the District Court indicates a concern over whether an employer with knowledge of a supervisor's tortious conduct which fails to put a stop to the supervisor's conduct, despite repeated requests from the plaintiff, can be held liable for the tortious conduct. In our prior cases, we have stated that when a supervisor engages in tortious conduct such as sexual or other types of harassment, the supervisor's knowledge and actions may be imputed to the employer. Furthermore, an employer's liability may also be premised on its failure to remedy, or its ratification of, tortious conduct.

In *Hanlon v. Chambers*, 195 W.Va. 99, 108, 464 S.E.2d 741, 750 (1995), we said that:

Where an agent or supervisor of an employer has caused, contributed to, or acquiesced in the harassment, then such conduct is attributed to the employer, and it can be fairly said that the employer is strictly liable for the damages that result.

We went on to state that an employer "must do what it can to prevent harassment and must respond swiftly and effectively to complaints about harassment. The sufficiency of the employer's response determines its legal responsibility.... Each case will turn on its own particular circumstances.... The point is that common sense must be applied to the facts in each case to determine whether the employer took direct and prompt action 'reasonably calculated' to end the harassment." 195 W.Va. at 108–09, 464 S.E.2d at 750–51.

We believe that the reasoning of *Hanlon v. Chambers* is equally applicable to the tort of outrage. We made clear that a supervisor may be held individually liable for the tort of outrage when committed during the course of employment, and reversed the trial court's dismissal of the plaintiff's claims of outrageous conduct by his supervisor in *Harless v. First National Bank in Fairmont, supra.* 169 W.Va. at 683–85, 289 S.E.2d at 698–99. Today we make clear the converse, that an employer may be held individually liable for contributing to or allowing outrageous conduct by a supervisor in the workplace. An employer must do what it can to prevent outrageous conduct arising from the employment relationship, and must respond swiftly and effectively to complaints of such conduct.

Accordingly, we hold that where a supervisor of an employer has, within the scope of employment, caused, contributed to, or acquiesced in the intentional or reckless infliction of emotional distress upon an employee, then such conduct is attributed to the employer, and the employer is liable for the damages that result.

We conclude, therefore, that the District Court's second question should be answered "yes." An employer may be held liable for a supervisor's outrageous actions committed within the scope of employment, and an employer may be held liable for causing, contributing to, or acquiescing to the commission of outrageous conduct occurring during the course of employment.

### C. *Statute of Limitation*

■ The third question certified by the District Court concerns when the statute of limitation is triggered for the intentional or reckless infliction of emotional distress. "A claim for severe emotional distress arising out of a defendant's tortious conduct is a personal injury claim and is governed by a two-year statute of limitations under W.Va. Code, 55–2–12(b) (1959)." Syllabus Point 5, in part, *Courtney v. Courtney,* 190 W.Va. 126, 437 S.E.2d 436 (1993).

In this case, the plaintiff has alleged that he was subjected to abuse and harassment by Richards for a period of approximately four years, beginning in 1990. In January 1994, the plaintiff was transferred away from Richards' supervision. However, sometime in April 1994 the plaintiff went on vacation, and when he returned he discovered he had been transferred back to Richards' department. The plaintiff went back on vacation for another week at the request of Ms. Sexton, the defendant human resources director, to allow the defendant time to find another position for the plaintiff. The plaintiff contends that he repeatedly attempted to have upper management transfer him to another department, and even offered to take a demotion, to be removed from the possibility of harassment by Richards.

When defendant Alcon refused to transfer the plaintiff away from Richards and told him to return to Richards' supervision, the plaintiff quit. The parties seem to agree that the plaintiff terminated his employment on May 15, 1994, and that he filed this lawsuit on May 2, 1996.

On the one hand, the defendant contends that the "last outrageous act" by Richards could have last occurred sometime in January 1994, and certainly no later than April 1994; therefore, the defendant argues that the plaintiff's May 2, 1996 complaint was not timely filed within two years of the last known intentional or reckless act of the defendant. The plaintiff, on the other hand, argues that defendant Alcon last assisted and ratified the acts of Richards on May 15, by compelling the plaintiff to return to Richards' department; hence, the plaintiff contends that the last outrageous act occurred on the day that he claims he was constructively discharged from his employment, and that his statute of limitation was triggered on that date.

We addressed a similar statute of limitation question in *Harmon v. Higgins,* 188 W.Va. 709, 426 S.E.2d 344 (1992), a case where the female plaintiff alleged sexual harassment and discrimination. We said:

> In cases involving allegations of discharge from employment related to claims of sexual harassment or discrimination, a two-year statute of limitations for personal injuries begins to run on the date of the last offensive contact, or threat of offensive

contact, which precipitated the termination of employment.

Syllabus Point 3, *Harmon v. Higgins, supra.* In *Harmon,* the plaintiff last had contact with her allegedly harassing supervisor on September 24, 1986, but did not terminate her employment until September 30, 1986 when she had a disagreement with another employee. We held that the plaintiff's filing of her suit on September 27, 1988 was outside the two-year statute of limitation, because the last offensive contact or threat of offensive contact which precipitated the termination of employment occurred on September 24, 1986.

 We believe that a similar rule applies to claims for intentional or reckless infliction of emotional distress, and that the facts alleged in the instant case are sufficient to support the plaintiff's contention that his claim was timely filed. We hold that, in claims for intentionally or recklessly inflicted emotional distress that arise from a termination of employment, the two-year statute of limitation for personal injuries begins to run on the date of the last extreme and outrageous conduct, or threat of extreme and outrageous conduct, which precipitated the termination of employment.

### D. *Human Rights Act*

The final question by the District Court concerns whether the West Virginia Human Rights Act, *W.Va.Code,* 5–11–1 to –19, creates a nebulous public policy against all forms of harassment for purposes of wrongful discharge. *W.Va.Code,* 5–11–2 [1994] declares:

It is the public policy of the state of West Virginia to provide all of its citizens equal opportunity for employment, equal access to places of public accommodations, and equal opportunity in the sale, purchase, lease, rental and financing of housing accommodations or real property. Equal opportunity in the areas of employment and public accommodations is hereby declared to be a human right or civil right of all persons without regard to race, religion, color, national origin, ancestry, sex, age, blindness or handicap. Equal opportunity in housing accommodations or real property is hereby declared to be a human right or civil right of all persons without regard to race, religion, color, national origin, ancestry, sex, blindness, handicap, or familial status.

The denial of these rights to properly qualified persons by reason of race, religion, color, national origin, ancestry, sex, age, blindness, handicap, or familial status is contrary to the principles of freedom and equality of opportunity and is destructive to a free and democratic society.

The plaintiff was a white male under 40 years of age [9] at the time that he quit working for the defendant. However, he contends that the West Virginia Human Rights Act in general, and *W.Va.Code,* 5–11–2 [1994] in particular, establishes a substantial public policy that no individual may be deprived of his human rights or civil rights for any reason in West Virginia. He then reasons that all forms of harassment of an individual by his employer is violative of those human rights and civil rights.

 In any employment case under the West Virginia Human Rights Act, we believe that the question to be decided is not whether an employment decision was fair or made in accordance with pre-established procedures. The question is whether the individual was discriminated against because of race, religion, color, national origin, ancestry, sex, age, blindness, or handicap. Accordingly, we answer the District Court's question in the negative, and hold that no general public policy against harassment in the workplace is created by the West Virginia Human Rights Act for purposes of West Virginia wrongful discharge law.

### IV.

#### *Conclusion*

For the reasons discussed above, we have answered the District Court's four questions

---

9. The Act protects individuals from discrimination based upon "age," a term defined as "the age of forty or above[.]" *W.Va.Code,* 5–11–3(k) [1994]. Discrimination "means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, sex, age, blindness, handicap or familial status and includes to separate or segregate[.]" *W.Va.Code,* 5–11–3(h) [1994].

by holding, first, that in order for a plaintiff to prevail in a claim for the tort of outrage, the plaintiff must prove the four elements discussed above: outrageous conduct by the defendant, intent or recklessness, causation, and severe emotional distress by the plaintiff. Second, when the tort of outrage occurs in the employment context, an employer may be liable when the outrageous conduct is committed by a supervisor, and when the employer causes, contributes to, or acquiesces in the infliction of emotional distress upon an employee. Third, the statute of limitation is triggered on the date of the last outrageous conduct or threat of outrageous conduct. And lastly, on the facts presented in this case, we can discern no ,legislative policy contained in the Human Rights Act protecting employees from harassment in general.

Certified questions answered.