# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2016 Term

_____

No. 15-0695

_____

FILED

November 17, 2016

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

HERBERT J. THOMAS MEMORIAL
HOSPITAL ASSOCIATION,
Defendant Below, Petitioner

v.

SUSAN NUTTER,
Plaintiff Below, Respondent

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Tod J. Kaufman, Judge
Civil Action No. 11-C-11335

REVERSED AND REMANDED

_____

Submitted: September 14, 2016
Filed: November 17, 2016

Bryan R. Cokeley, Esq.                    Kelly Elswick-Hall, Esq.
Katherine M. Mullins, Esq.               Marvin W. Masters, Esq.
Steptoe & Johnson PLLC                   The Masters Law Firm LC
Charleston, West Virginia                Charleston, West Virginia
Counsel for the Petitioner               Counsel for the Respondent

CHIEF JUSTICE KETCHUM delivered the Opinion of the Court.

JUSTICE BENJAMIN, deeming himself disqualified, did not participate.

JUDGE JOHN A. HUTCHISON, sitting by temporary assignment.

**JUSTICE DAVIS and JUSTICE WORKMAN dissent and reserve the right to file separate opinions.**

**JUSTICE LOUGHRY concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.**

**SYLLABUS BY THE COURT**

1. "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo.*" Syllabus Point 1, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009).

2. "When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party." Syllabus Point 2, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009).

3. "In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved." Syllabus Point 5, *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593 (1983).

i

4.    "The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge." Syllabus, *Harless v. First Nat'l Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978).

5.    "In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established.  It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it."  Syllabus Point 3, *Travis v. Alcon Labs., Inc.*, 202 W.Va. 369, 504 S.E.2d 419 (1998).

Chief Justice Ketchum:

In this appeal from the Circuit Court of Kanawha County, we are asked to examine a jury's verdict that found a hospital wrongfully discharged a nurse in a manner designed to undermine public policy. As a result of that wrongful discharge finding, the jury also concluded that the hospital had intentionally inflicted emotional distress on the nurse and had defamed her. Finally, the jury found that the hospital failed to pay the nurse her full wages. The hospital contends on appeal that there is insufficient evidence to support the verdict.

After reviewing the eight-day trial transcript, we reverse the $1,004,900 jury verdict against the hospital. We find no evidence to support the jury's conclusion that the hospital wrongfully discharged the nurse in order to jeopardize or undermine a specific public policy. We also find insufficient evidence to say the discharge was intended to inflict emotional distress upon the nurse. Further, we find that the nurse's claim for defamation was barred by a one-year statute of limitation. As set forth below, we hold that the circuit court should have granted judgment as a matter of law to the hospital on these three allegations.

As for the final issue, whether the nurse is due unpaid wages from the hospital, we find that the circuit court's conduct and rulings during the trial (including the way it asked over 300 questions of the witnesses) undermined the reliability of the jury's verdict. We therefore reverse the jury's verdict on unpaid wages and remand the case for a new trial on that single issue.

1

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Susan Nutter is a registered nurse. In August 2008, she was hired by the defendant hospital, Herbert J. Thomas Memorial Hospital Association ("Thomas Memorial"). This case arises from the plaintiff's firing in November 2009.

The plaintiff was hired to work as a "charge nurse" in the geriatric psychiatric unit, also called the "Med-Psych Unit." A charge nurse is paid a "charge nurse differential," a premium in addition to the base salary for a registered nurse. The Med-Psych Unit serves elderly patients who have medical issues too serious for a nursing home and psychiatric issues too serious for the general population of the hospital. The unit is a locked area with capacity for up to ten patients in five rooms. Typically, the unit is staffed during the day with one registered nurse, one licensed practical nurse, and a mental health technician. Social workers and therapists rotate through as they provide services.

In February 2009, Thomas Memorial placed the plaintiff on an improvement plan, due to her being "unable to complete tasks in a timely manner; orders not signed off timely; nursing documentation incomplete; [and] lack of daily progress notes." The plaintiff's nurse manager wrote that the plaintiff needed to improve her completion of written "orders and charting." The nurse manager later testified that the plaintiff had "time management issues," and that her handling of patient files "was a constant shuffling of paperwork" and "disorganization," "[j]ust not having a handle on

2

this belongs here, this needs to go there," and "just constant movement of things from place to place."

In April 2009, the plaintiff visited Thomas Memorial's human resources department to ask for a transfer to another unit. The plaintiff said the nurse on the shift following hers was rude when the plaintiff was "trying to get charting done at the end of the shift." The plaintiff admitted to the human resources department that she thought her nurse manager was "doing an excellent job," and that her nurse manager placed her on an improvement plan "to try and get her charting up to par." The human resources department told the plaintiff she was not eligible to transfer while she was on an improvement plan. Thereafter, the plaintiff never returned to the human resources department, and never again sought to transfer to another unit.

The plaintiff successfully completed her improvement plan in May 2009, and in August 2009, met with her nurse manager for an annual performance evaluation. In that meeting, the plaintiff wrote that she had "good communication with manager."

**A. November 12, 2009**

The Med-Psych Unit used two, one-page forms to record information.

The first form was the "Patient Education Record." This one-page form was completed for each patient, every day, and was used to chart educational interactions between the patient and hospital staff. The educational activities included "current events," "recreational therapy," and "medication management." The completed form became part of the patient's official medical record. Thomas Memorial asserts the

3

plaintiff falsely completed one part of a Patient Education Form for each of nine patients on November 12, 2009.

The second form is the "Patient Observation – Q15 Minute Flow Sheet." Again, this one-page form was completed for each patient, every day. Mental health technicians on the Med-Psych Unit were given the task of observing each patient at least once every 15 minutes and noting the patient's location and activity on the form. The technician would initial each 15-minute block. The completed form became part of the patient's official medical record.

On the day shift of November 12, 2009, at 11:45 a.m., a music therapist was scheduled to provide musical therapy to all nine patients in the Med-Psych Unit. The therapy took place in a group setting. However, only one patient attended the voluntary session. On that patient's Patient Education Record, under the heading "Recreational Therapy," the music therapist noted in writing that, between 11:45 and 12:25, she had a one-on-one session with the patient. As to the other eight patients on the unit, the music therapist wrote on each patient's Patient Education Record that, between 11:45 and 12:25, five patients were in bed, one was "in room, then sat in hallway," another was "not feeling well," and the last patient was "on phone, then came in at end."

Several hours later, when the music therapist reviewed the files for the patients in the Med-Psych Unit, she discovered that the plaintiff made notations on a section of the Patient Education Record for "medication management." The plaintiff's notations said she met individually with all nine patients – including the patient who attended the music therapist's session – between 12:00 and 12:45. The plaintiff's notes

4

for each patient were identical: that the plaintiff gave each patient one-on-one medication education from 12:00 to 12:45; that each patient "attended"; that each patient "participated"; and that each patient "partially meets objective needs reinforcement." The plaintiff also signed each form.

The music therapist concluded that the plaintiff's notations on each Patient Education Record overlapped and conflicted with the music therapist's notations. The music therapist had conducted her session, and noted the location of each patient, from 11:45 until 12:25. The music therapist believed that the plaintiff had engaged in "charting fraud" by charting her activities from 12:00 until 12:45. The music therapist then informed the plaintiff's nurse manager of the charting conflict.

Later that same day, the nurse manager spoke with the music therapist and other staff members in the Med-Psych Unit. The nurse manager also spoke to several patients. She did not speak to the plaintiff because, by that time, the plaintiff's shift had ended and she had left the hospital. In addition, the nurse manager reviewed patient files. The nurse manager learned that the "Patient Observation – Q15 Minute Flow Sheets," completed by a mental health technician, were consistent with the music therapist's notes and inconsistent with the plaintiff's. For instance, the mental health technician recorded that two patients were asleep for the entire time that the plaintiff allegedly conducted her medication education sessions. Based on this information, the nurse manager concluded that the plaintiff had falsely documented care "to complete the paperwork to say the job had been done."

The nurse manager took her findings to the chief nursing officer for Thomas Memorial. The chief nursing officer agreed that the evidence indicated that the plaintiff had falsified the Patient Education Records, and stated that falsifying patient files was a terminable offense. The nurse manager also took her findings to the human resources manager for Thomas Memorial. The human resources manager agreed that, absent a compelling explanation, termination was the appropriate sanction.

## B. Plaintiff's Termination

On November 16, 2009, the plaintiff was summoned to a meeting in the human resources office with the plaintiff's nurse manager, the human resources manager, and the acting director of the behavioral health department. The human resources manager testified that she conducted the meeting as an investigation into whether the plaintiff had committed a terminable offense, and sought to determine whether the plaintiff could explain away or contradict the pre-meeting evidence.

At the meeting, the three managers discussed the November 12th medical documentation with the plaintiff. The plaintiff could not explain the time overlap or the conflicting documentation. At the end of the meeting, the representatives of Thomas Memorial concluded the plaintiff had "documented care she did not give." The human resources manager therefore informed the plaintiff that her employment was terminated.

The chief nursing officer for Thomas Memorial, herself a registered nurse, knew that if a registered nurse "falsified patient records [or] intentionally charted incorrectly" it was "professional misconduct subject to disciplinary action" that, by law,

6

had to be reported the West Virginia Board of Examiners for Registered Professional Nurses ("the Board").[1]  Accordingly, on November 17, 2009, the chief nursing officer wrote a one-page letter to the Board stating that the plaintiff's employment had been terminated because "chart reviews . . . indicated [the plaintiff] had falsely documented educational sessions with patients."  The chief nursing officer did not advocate that the Board take any particular action, and did not include any documents with the letter.

The Board of Nursing later served a subpoena on Thomas Memorial seeking documents from the plaintiff's employment file.  A Board investigator noted the plaintiff's "numerous disciplinary actions related to documentation errors" and concluded that the plaintiff should have additional education "related to legalities of documentation[.]"  The Board then sent a letter to the plaintiff advising her that no action would be taken against her license.  Nevertheless, the Board "caution[ed the plaintiff] to review [her] current practice for measures of improvement related to documentation."

### C. Proceedings Below

On August 11, 2011, the plaintiff filed a *three count* complaint against defendant Thomas Memorial.  Count I alleged that the plaintiff's firing by Thomas Memorial was a "retaliatory discharge," a cause of action that arises "where the employer's motivation for the discharge is to contravene some substantial public policy

---

[1] 19 C.S.R. § 3.14.1.u [2007].  *See also* 19 C.S.R. § 3.14.1.aa [2007] (It is "professional misconduct subject to disciplinary action" if a licensed nurse "failed to report to the board within thirty (30) days, knowledge of a violation by a registered professional nurse of . . . this rule[.]")

7

principle[.]"[2]  Count II alleged that the hospital engaged in the intentional infliction of emotional distress, in part by "filing a false complaint" with the Nursing Board.  Finally, Count III alleged that the hospital violated the West Virginia Wage Payment and Collection Act.[3]  Specifically, the plaintiff alleged she was hired by Thomas Memorial to work as a "charge nurse" but the hospital failed to pay her the promised "charge nurse differential."

An eight-day jury trial on the plaintiff's complaint began on April 1, 2014. At the conclusion of the plaintiff's case in chief, and again at the close of all the evidence, the hospital moved for judgment as a matter of law.  The circuit court denied the motions.  The circuit court then instructed the jury on *four causes of action* against Thomas Memorial. In addition to the three causes of action asserted in the plaintiff's complaint, the circuit court instructed the jury it could consider whether the plaintiff had been defamed by Thomas Memorial's letter to the Board of Nursing.

The jury was presented with four special interrogatories.  The jurors voted "yes" to all four and said that the plaintiff had proved, by a preponderance of the evidence, that Thomas Memorial had "wrongfully discharged the plaintiff;" had "committed intentional infliction of emotional distress upon the plaintiff;" had "defamed the plaintiff;" and had "failed to pay [the plaintiff] any proper charge nurse wages due to

---

[2] Syllabus, in part, *Harless v. First Nat'l Bank,* 162 W.Va. 116, 246 S.E.2d 270 (1978).

[3] *See* W.Va. Code §§ 21-5-1 to -18.

8

her[.]" The jury awarded the plaintiff $998,000.00 for past and future lost wages, emotional distress, and for damages to her reputation. Additionally, the jury awarded the plaintiff $6,900.00 as "wages not paid" for the charge nurse differential.

The circuit court entered judgment on the verdict, and defendant Thomas Memorial timely filed a post-trial motion asking for judgment as a matter of law under Rule 50(b) of the West Virginia Rules of Civil Procedure. In the alternative, the hospital also asked for a new trial under Rule 59(e). In an order dated June 23, 2015, the circuit court denied the defendant's post-trial motions.

Thomas Memorial now appeals the circuit court's order.

**II.**
**STANDARD OF REVIEW**

"Rule 50(b) of the West Virginia Rules of Civil Procedure allows a defendant to move for a judgment [as a matter of law] if, with respect to an issue essential to a plaintiff's case, there exists no legally sufficient evidentiary basis for the jury to find in favor of the plaintiff."[4] "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*."[5]

When this Court reviews a trial court's order granting
or denying a renewed motion for judgment as a matter of law

---

[4] *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 481, 457 S.E.2d 152, 158 (1995).

[5] Syllabus Point 1, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009).

9

after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.[6]

We use the following guideline to weigh whether there is sufficient evidence to support the jury's verdict:

> In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.[7]

## III.
## ANALYSIS

Thomas Memorial's overall contention is that, as a matter of law, the plaintiff failed to produce sufficient evidence to support the jury's four-part verdict. First, Thomas Memorial argues the plaintiff failed to prove the elements of a cause of action for wrongful discharge. Second, Thomas Memorial argues the plaintiff failed to

---

[6] Syllabus Point 2, *id.*

[7] Syllabus Point 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983).

10

prove the elements for intentional infliction of emotional distress. Thomas Memorial asserts neither of these claims should have been allowed to go to the jury.

Third, Thomas Memorial argues that a cause of action for defamation has a one-year statute of limitation, and the plaintiff filed her lawsuit more than one year after learning of the alleged defamatory acts. Whether defamation was proven at trial or not, Thomas Memorial asserts the circuit court failed to recognize that this cause of action was barred by the statute of limitation and never should have been decided by the jury

Lastly, Thomas Memorial appears to concede it did not pay the plaintiff her charge nurse differential. However, Thomas Memorial argues it was the plaintiff's obligation to specially "code" her time when she clocked in so as to receive the charge nurse differential. Since the plaintiff did not code in her time as a charge nurse, Thomas Memorial contends it had no duty to pay her wages for that work.

In the alternative, Thomas Memorial asserts the circuit court abused its discretion in refusing to grant a new trial. It argues that the jury's verdict was clouded by a host of evidentiary errors by the circuit court. More significantly, Thomas Memorial contends that the circuit court's conduct (such as asking over 300 questions, and taking the defense attorney's notes) altered the trial's outcome and made the jury's verdict inherently unreliable.

As we discuss below, we reverse and find that the circuit court erred in allowing the claims for wrongful discharge, intentional infliction of emotional distress, and defamation to be decided by the jury. Additionally, because of the circuit court's

11

interjections and actions at trial, we reverse the award of damages to the plaintiff on her wage payment claim and remand that claim alone for a new trial.

## A. Wrongful Discharge

Thomas Memorial's first assignment of error is that the circuit court erred in refusing to grant its motion for judgment as a matter of law on the plaintiff's claim that she was wrongfully discharged. Thomas Memorial asserts that there was no evidence supporting the plaintiff's allegation that the hospital violated the federal regulations quoted by the judge as public policy.[8] Thomas Memorial contends that the mere recitation of a rule or a regulation by a plaintiff is insufficient; instead, the plaintiff must show that the discharge, in some way, jeopardized or violated the public policy that the rule or regulation mandates.

---

[8] Thomas Memorial repeatedly asserts in its appeal briefs that the only record of the plaintiff's complaints is the plaintiff's testimony alone. The hospital argues that, while the plaintiff said she had good communication with her nurse manager during her employment, neither the nurse manager nor any of her other supervisors or fellow employees recalled the plaintiff lodging any of the complaints she made in her lawsuit. The hospital also points out that the plaintiff offered no contemporaneous writings about her complaints, and there is no written record of any complaint being made either to hospital personnel or any government agency.

Unfortunately for the hospital, an employee's testimony about on-the-job complaints is usually sufficient to create a question of material fact in a wrongful discharge case. The absence of additional evidence affects the weight or credibility of the plaintiff's evidence, not its sufficiency. In the instant appeal, we presume the plaintiff made the complaints as she testified. "[T]he credibility of the witnesses will not be considered, conflicts in testimony will not be resolved, and the weight of the evidence will not be evaluated." *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 482, 457 S.E.2d 152, 159 (1995). We reject the hospital's *sub silentio* suggestion that we reassess the evidence.

At trial, the plaintiff asserted she was wrongfully discharged by Thomas Memorial in order to subvert substantial public policy. The plaintiff testified that she complained about numerous issues in the Med-Psych Unit during her employment, including (1) that the hospital might be committing Medicare fraud in its billing practices; (2) that the hospital was not caring for patients because there were no defibrillators in the Unit, some patients did not wear skid-proof socks, and only one shower was available for patients; (3) that patients were being discharged to nursing homes with orders for only thirty days of medication; (4) and nurses were improperly calling in prescriptions to pharmacies. The plaintiff also thought there should be additional staffing. The circuit court instructed the jury on six federal regulations as sources of substantial public policy.

The general rule is that an employer may discharge an "at will" employee at any time and for any reason.[9] This rule is tempered by various exceptions, one of which is that an employee may not be discharged to subvert public policy.

> The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy

---

[9] *Kanagy v. Fiesta Salons, Inc.*, 208 W.Va. 526, 529, 541 S.E.2d 616, 619 (2000) ("At common law, an at-will employee serves at the will and pleasure of his or her employer and can be discharged at any time, with or without cause."); Syllabus Point 2, *Wright v. Standard Ultramarine & Color Co.*, 141 W.Va. 368, 368, 90 S.E.2d 459, 461 (1955) ("When a contract of employment is of indefinite duration it may be terminated at any time by either party to the contract.").

13

principle, then the employer may be liable to the employee for damages occasioned by this discharge.[10]

"[A] cause of action for wrongful discharge exists when an aggrieved employee can demonstrate that his/her employer acted contrary to substantial public policy in effectuating the termination."[11] "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions."[12] "A determination of the existence of public policy in West Virginia is a question of law, rather than a question of fact for a jury."[13]

Justice Davis, in the seminal case *Feliciano v. 7-Eleven, Inc.,*[14] discussed four factors courts should weigh to determine "whether an employee has successfully presented a claim of relief for wrongful discharge in contravention of substantial public policy[.]"[15] The test proposed by Justice Davis requires the plaintiff to plead and prove the following elements:

---

[10] Syllabus, *Harless,* 162 W.Va. at 116, 246 S.E.2d at 270.

[11] *Feliciano v. 7-Eleven, Inc.*, 210 W.Va. 740, 745, 559 S.E.2d 713, 718 (2001).

[12] Syllabus Point 2, *Birthisel v. Tri-Cities Health Servs. Corp.,* 188 W.Va. 371, 424 S.E.2d 606 (1992).

[13] Syllabus Point 1, *Cordle v. Gen. Hugh Mercer Corp*., 174 W.Va. 321, 325 S.E.2d 111 (1984).

[14] 210 W.Va. 740, 559 S.E.2d 713 (2001).

[15] 210 W.Va. at 750, 559 S.E.2d at 723.

14

1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).[16]

Under this test, a plaintiff cannot simply cite a source of public policy and then make a bald allegation that the policy might somehow have been violated. There must be some elaboration upon the employer's act jeopardizing public policy and its nexus to the plaintiff's discharge. "The mere citation of a statutory provision is not sufficient to state a cause of action for retaliatory discharge without a showing that the discharge violated the public policy that the cited provision clearly mandates."[17]

---

[16] Henry H. Perritt, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. Cin. L. Rev. 397, 398-99 (1989). *See also Collins v. Rizkana*, 73 Ohio St. 3d 65, 69–70, 652 N.E.2d 653, 657–58 (1995) (adopting four factor test to determine if a plaintiff has a viable cause of action in tort for wrongful discharge); *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004) ("Having alleged a violation of public policy, to succeed in his wrongful-discharge claim Lloyd must thus prove: (1) The existence of a clearly defined public policy that protects an activity. (2) This policy would be undermined by a discharge from employment. (3) The challenged discharge was the result of participating in the protected activity. (4) There was lack of other justification for the termination.").

[17] *Swears v. R.M. Roach & Sons, Inc.*, 225 W. Va. 699, 705, 696 S.E.2d 1, 7 (2010).

We presume that the circuit court correctly stated public policies in the six federal regulations that it recited to the jury.[18] Our focus is upon the second element of *Feliciano*, that is, whether the plaintiff's discharge undermined the stated public policies. Our goal with this element is to ensure that an employer's personnel management decisions will not be challenged unless a public policy has, in fact, been jeopardized.

The trial record is scattered with questions and statements that suggest Thomas Memorial's actions *might* have involved Medicare fraud; *might* have ignored patient care matters; *might* have improperly discharged patients to nursing homes with limited supplies of medication; or *might* have allowed nurses to call in prescriptions to pharmacies. In accordance with our standard of review,[19] we take the plaintiff's testimony that she complained about these issues as true, and we accept as correct the inference that these complaints were known to the hospital.

What we cannot find in the record is any evidence by which a jury could actually find that these "*might have*" events violated a specific policy. For instance, the plaintiff complained that Thomas Memorial wasn't providing certain therapies to every patient, every day, and that *if* the hospital billed for those services, then the hospital *might* be engaging in Medicare fraud. The problem was that the plaintiff never participated in hospital billing matters, and did not know how the hospital was reimbursed by Medicare

---

[18] In their briefs, neither party cited the actual federal regulations in effect during the plaintiff's employment. However, neither party suggests the circuit court's instructions improperly interpreted, or deviated in any way from, the actual regulations.

[19] Syllabus Point 5, *Orr v. Crowder*, 173 W.Va. at 335, 315 S.E.2d at 593.

for specific services. While the hospital introduced compelling evidence that it was reimbursed on a flat fee basis (and was paid regardless of whether a service was provided or not), that does not enter our analysis. It is axiomatic that Medicare fraud is a violation of public policy; the problem is that the plaintiff did not introduce any evidence showing Medicare fraud occurred.

Likewise, the plaintiff complained that there was no defibrillator in the Med-Psych Unit, that patients were not always wearing no-slip socks, or that there was only one operational shower. This testimony certainly indicates the plaintiff was caring and compassionate toward her patients. However, the plaintiff offered no testimony showing the hospital's acts violated any standard of care, or any guideline, so as to support her claim that a clear public policy had been jeopardized. It is axiomatic that patients must receive good and adequate care. However, nothing in the record could be construed, as a matter of public policy, to say that a defibrillator was required in the Med-Psych Unit (as opposed to next door in another unit), or that patients weren't allowed to wear their own socks. There was also no evidence to say that patients weren't being properly and timely bathed.

Additionally, there was no evidence to say that the manner in which the hospital discharged patients violated Medicare guidelines. The only evidence on that question was the plaintiff's suggestion that Medicare could do it in a different, and perhaps money-saving, way. There was also no evidence establishing specific instances of nurses calling in prescriptions for doctors in a manner that violated a clear public

17

policy. Overall, we see nothing to suggest the plaintiff's termination in any way thwarted the ostensible public policies cited by the circuit court.

The plaintiff also complained that the Med-Psych Unit was understaffed. The plaintiff testified that Thomas Memorial told her at her hiring that a secretary would be available to the Unit for several hours a day to assist with paperwork. However, that did not happen. Further, in February 2008 (before the plaintiff was hired), the Centers for Medicare and Medicaid Services ("CMS") inspected the hospital and audited its records. In a written report, CMS determined that the hospital did not have adequate staffing on a *different unit*, the Med-Surg Unit.[20]

Federal regulations administered by CMS require a hospital to have "adequate numbers of licensed registered nurses" to provide patient care "as needed."[21] At trial, the plaintiff offered her lay opinion that this regulation meant there must "be a nurse available for each patient for a whole shift if necessary." The plaintiff asserts these facts establish she was discharged to undermine a substantial public policy requiring an adequate number of nurses.

To support her case, the plaintiff contends that the facts of her case are identical to those found in Chief Justice Workman's opinion in *Tudor v. Charleston Area*

---

[20] The report stated that "it was determined that the hospital failed to ensure adequate numbers of nursing personnel to provide nursing care to patients on the Third Floor Med/Surg Unit[.]"

[21] 42 C.F.R. § 482.23(b) [2014] provides, in part, "The nursing service must have adequate numbers of licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients as needed."

18

*Medical Center, Inc.*[22] *Tudor* involved a nurse who was (constructively) discharged after complaining about only one nurse being assigned to a unit. The public policy at issue was a state, rather than federal, regulation which required hospitals to provide an "adequate number of licensed registered professional nurses[.]"[23] This Court upheld a jury verdict in nurse Tudor's favor on her wrongful discharge claim. The plaintiff encourages us to follow *Tudor* and do the same for her.

*Tudor*, however, contains significant facts that reveal the weakness of, and completely distinguish it from, the instant case. First, in the instant case, we have only the plaintiff's testimony that she complained about staffing problems in the Med-Psych Unit. While we accept her testimony as true, we noted in *Tudor* that evidence was adduced to actually prove inadequate staffing was both problematic and brought to the attention of the hospital:

> [The hospital's nurse manager] further testified that no other nurses ever complained about having only one nurse assigned to the shift. The [plaintiff], however, produced several nurses who testified that complaints by various nurses had been voiced over this staffing concern. The [plaintiff] further voiced her concerns to several supervisory employees including Johana McKitrick and Darlene Surbaugh, the charge nurses for the unit, Darla Brumfield, a nursing supervisor, and Mike King, CAMC's Vice President of Operations. . . . Finally, Dr. Kisner testified that the Appellee had verbally told her that she had reported her concerns to

---

[22] 203 W.Va. 111, 506 S.E.2d 554 (1997).

[23] 203 W.Va. at 123, 506 S.E.2d at 566.

19

Janet Fairchild, the executive secretary for the West Virginia Board of Nurse Examiners.[24]

Second, and the most distinguishing feature of *Tudor*, is that the plaintiff in *Tudor* introduced evidence specifically demonstrating how the public policy was being violated and jeopardized by the hospital's actions. As Chief Justice Workman noted, hospital records, hospital guidelines and policies, and expert testimony showed the public policy was being routinely violated:

> The [plaintiff] also introduced in evidence the hospital guidelines which indicated that more than one nurse or care giver was required on any give[n] shift. Further, Rachel Byrd, CAMC's Director of Nursing, testified that between 1991 and 1993, the unit was consistently understaffed according to CAMC's own Medicus records. According to Ms. Byrd, the practice of assigning only one nurse per shift on the unit also contravened internal policies adopted by CAMC's nursing administrators which required a minimum of two care givers per shift. Finally, Dr. Deborah Kisner, Professor and Director of Nursing Education at Fairmont State College, testified that CAMC's practice of routinely assigning only one nurse to the unit was unsafe.[25]

In the instant case, there is no evidence specifically demonstrating whether and how a public policy was being broken or undermined by the hospital's actions. Assuming as true that Thomas Memorial promised the plaintiff several hours of secretarial support per day, and that the hospital failed to provide such support, we see no evidence in the record suggesting that secretarial support was required to meet the CMS

[24] 203 W.Va. at 118 n.6, 506 S.E.2d at 561 n.6.

[25] 203 W.Va. at 123 n.28, 506 S.E.2d at 566 n.28.

requirement that a hospital provide adequate numbers of licensed registered nurses to provide nursing care to all patients. The plaintiff offered no hospital guidelines or policies to suggest the Med-Psych Unit was understaffed, no Medicare or Medicaid guidelines regarding staffing levels for a psychiatric unit, or any other recognized measures of proper staffing. The plaintiff likewise offered no testimony that the hospital's staffing practices in the Med-Psych Unit were in violation of or otherwise jeopardized the CMS regulation.

The plaintiff's only concrete evidence suggestive of inadequate staffing is the CMS inspection report from February 2008 pertaining to a different hospital unit. Setting aside the fact that this inspection was done six months before the plaintiff's hiring, and involved a *wholly different unit* from the plaintiff's, the CMS report demonstrates the lack of evidence in the plaintiff's case. The CMS report details (with emphasis added) that Thomas Memorial failed to "ensure adequate numbers of nursing personnel . . . on the Third Floor Med/Surg Unit" because the unit was "understaffed (*based on hospital staffing plan*[).]" The plaintiff failed to prove how the Med-Psych Unit was understaffed based upon the hospital's staffing plan, or understaffed according any other guideline or policy.

We have scoured the extensive trial record to find all evidence favorable to the plaintiff, and assumed that all conflicts in the evidence and favorable inferences were resolved by the jury in favor of the plaintiff. We are simply unable to find any evidence from which a jury could conclude that Thomas Memorial contravened some substantial public policy principle. The plaintiff's mere citation of federal regulations as sources of

21

public policy is insufficient. We have also scrutinized the parties' briefs, seeking specific links to say what evidence supports a breach of each regulation cited. We have found none.

On this record, we can find no legally sufficient evidentiary basis upon which a jury could find in favor of the plaintiff on her claim of wrongful discharge. The circuit court should have granted the defendant's hospital's motion for judgment as a matter of law on the wrongful discharge claim, and it erred when it failed to do so.

## B. Intentional Infliction of Emotional Distress

Thomas Memorial's second assignment of error is that the circuit court erred in refusing to grant its motion for judgment as a matter of law on the plaintiff's claim that the hospital intentionally inflicted emotion distress upon her. Thomas Memorial asserts that no reasonable jury could have reached this conclusion.

Our law permits a plaintiff to recover damages from a defendant "who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress" to the plaintiff.[26] Such a plaintiff must prove four elements in order to recover:

> In order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or

---

[26] Syllabus Point 6, *Harless v. First Nat. Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982).

substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.[27]

The first thing a plaintiff must prove is that the defendant's actions towards the plaintiff were atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency. It is not enough to say that "the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."[28] "The defendant's conduct 'must be more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct.'"[29]

The plaintiff asserts Thomas Memorial exceeded the bounds of decency when it wrongfully discharged her with the goal of undermining public policy. However, as we noted previously, we find no evidence to say that Thomas Memorial violated or undermined any specific public policy in its discharge of the plaintiff. Further, Thomas Memorial claims it discharged the plaintiff because it perceived she had intentionally and

---

[27] Syllabus Point 3, *Travis v. Alcon Labs., Inc.*, 202 W.Va. 369, 504 S.E.2d 419 (1998).

[28] *Tanner v. Rite Aid of W. Virginia, Inc.*, 194 W.Va. 643, 650-51, 461 S.E.2d 149, 156-57 (1995) (quoting *Restatement of Torts (Second)* § 46, cmt. d (1965)).

[29] *Travis*, 202 W.Va. at 375, 504 S.E.2d at 425 (quoting *Grandchamp v. United Air Lines, Inc.,* 854 F.2d 381, 383 (10th Cir. 1988)).

23

falsely completed documentation in patient files. When we read the record in a light most favorable to the plaintiff (particularly the plaintiff's testimony), and construe all inferences in the plaintiff's favor, at best the record establishes that the plaintiff completed the documentation carelessly and improperly. While Thomas Memorial's discharge of the plaintiff on the ground that she carelessly, improperly, or incorrectly documented her actions may not have been warranted, and might have been a grievous mistake, we simply cannot say that the hospital's actions in this case were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. A defendant cannot be held liable for a singular act that is merely "inconsiderate and unkind."[30]

"In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress."[31] In this case, Thomas Memorial's actions were not so extreme and outrageous so as to support a jury verdict. The circuit court should have granted the defendant's motion for judgment as a matter of law and dismissed the plaintiff's cause of action for intentional infliction of emotional distress.

---

[30] *Tanner*, 194 W.Va. at 651, 461 S.E.2d at 157.

[31] Syllabus Point 4, in part, *Travis*, 202 W.Va. at 371, 504 S.E.2d at 421.

24

### C. Defamation

As we have noted, the plaintiff filed a three-count complaint. At trial, however, the circuit court permitted the plaintiff to assert a fourth cause of action, defamation, and instructed the jury on this fourth action. Thomas Memorial makes much hay of the fact that the plaintiff never amended her complaint to add a defamation count. The plaintiff counters that her complaint did imply a cause of action for defamation based upon Thomas Memorial's report of her firing to the Nursing Board, and that she proved that cause of action because the jury awarded her damages for injury to her reputation.

Regardless of whether a cause of action was expressly or implicitly contained within the plaintiff's complaint, we agree with Thomas Memorial that a defamation cause of action never should have been presented to the jury. Thomas Memorial argues, of course, that it was required to file a report with the Board because its investigation left the hospital's director of nursing with the impression the plaintiff had violated nursing ethics rules, namely that she "falsified patient records [or] intentionally charted incorrectly." The director of nursing was compelled by those same ethics rules to file the report or face ethical sanctions herself.

However, in this appeal we assume that all of the plaintiff's evidence is true, and that the plaintiff produced more evidence than she did, and that Thomas Memorial fired her on trumped-up charges to contravene public policy. Taken together, the evidence at trial shows that the plaintiff knew or should have known of the hospital's allegedly defamatory report to the Board no later than December 11, 2009, when she wrote an eight-page letter responding to the hospital's report.

25

Thomas Memorial argues now, as it argued to the circuit court, that a cause of action for defamation has a one-year statute of limitation. "Numerous torts such as libel, defamation, false arrest, false imprisonment, and malicious prosecution take the one-year statute of limitations set forth in West Virginia Code § 55-2-12(c)."[32] The plaintiff filed her action on August 11, 2011, more than one year after learning of her potential defamation action.

By any reading of this record, the plaintiff's cause of action for defamation was barred by the one-year statute of limitation contained in W.Va. Code § 55-2-12(c).[33] Thomas Memorial was plainly entitled to judgment as a matter of law on this cause of action, and the circuit court erred in ruling otherwise.

---

[32] *Wilt v. State Auto. Mut. Ins. Co.*, 203 W.Va. 165, 170-171, 506 S.E.2d 608, 613-14 (1998). *See also Snodgrass v. Sisson's Mobile Home Sales, Inc.*, 161 W. Va. 588, 594, 244 S.E.2d 321, 325 (1978) ("[P]ersonal tort actions such as defamation, false arrest and imprisonment, and malicious prosecution . . . lacking statutory survivability and possessing no common law survivability, take a one-year statute of limitations under W.Va.Code, 55-2-12(c)."); *Rodgers v. Corp. of Harpers Ferry*, 179 W. Va. 637, 640-41, 371 S.E.2d 358, 361-62 (1988) ("The one-year statute of limitations in W.Va. Code § 55-2-12(c) applies to civil actions which do not survive the death of a party. Consequently, personal tort actions such as libel, defamation, intentional infliction of emotional distress, false arrest, false imprisonment, and malicious prosecution take the one-year statute of limitations[.]").

[33] W.Va. Code § 55-2-12(c) [1923] provides, in part:

> Every personal action for which no limitation is otherwise prescribed shall be brought: . . . (c) within one year next after the right to bring the same shall have accrued if it be for any other matter of such nature that, in case a party die, it could not have been brought at common law by or against his personal representative.

26

### D. Unpaid Wage Claim

Thomas Memorial's fourth assignment of error concerns the jury's award to the plaintiff of $6,900 for unpaid wages.

The plaintiff alleged she was hired to work as a charge nurse, and that Thomas Memorial promised to pay her a charge nurse differential, a premium above the base pay for a registered nurse. The plaintiff testified that, when she clocked in, her badge would not work properly and she was prohibited from entering the code specifying she was working as a charge nurse. Thomas Memorial asserts that it was the plaintiff's obligation, whenever she clocked in, to make sure she designated herself as a charge nurse. If she failed to properly note her status as a charge nurse, Thomas Memorial contends it was fair to not pay her the charge nurse differential.

On the record presented to the jury, we find sufficient evidence upon which a jury could rule in favor of the plaintiff. On this fourth count, we find no error in the circuit court's decision to deny Thomas Memorial's motion for judgment as a matter of law.

Unfortunately, we do not have confidence in the jury's verdict and are greatly troubled by the circuit court's conduct during the trial below. Because of the circuit court's evidentiary rulings, and because the circuit court asked over 300 questions of the witnesses, Thomas Memorial moved the circuit court for a new trial. The circuit court denied this motion. As to new trials, permitted under Rule 59 of the West Virginia

Rules of Civil Procedure, our general standard of review is to ask whether the ruling of the circuit court constituted an abuse of discretion.

> We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.[34]

We have said that, if a "verdict is against the clear weight of the evidence, is based on false evidence *or will result in a miscarriage of justice*, the trial judge may set aside the verdict, even if supported by substantial evidence, and grant a new trial."[35] A party is entitled to a new trial "if there is a reasonable probability that the jury's verdict was affected or influenced by trial error."[36] "The cumulative error doctrine may be applied in a civil case when it is apparent that justice requires a reversal of a judgment because the presence of several seemingly inconsequential errors has made any resulting judgment inherently unreliable."[37]

Thomas Memorial's brief relates a host of actions by the circuit court which, when judged as a whole, supports its argument that the jury's verdict is inherently

---

[34] *Tennant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995).

[35] Syllabus Point 3, in part, *In re State Public Building Asbestos Litigation,* 193 W.Va. 119, 454 S.E.2d 413 (1994) (emphasis added).

[36] *Tennant*, 194 W.Va. at 111, 459 S.E.2d at 388.

[37] Syllabus Point 8, *Tennant*, 194 W. Va. at 102, 459 S.E.2d at 379.

28

unreliable. For instance, Thomas Memorial contends the circuit court violated the duty of impartiality in its questioning of the witnesses. "The plain language of Rule 614(b) of the West Virginia Rules of Evidence authorizes trial courts to question witnesses – provided that such questioning is done in an impartial manner so as to not prejudice the parties."[38] Our law is clear that the "paramount function of the trial judge is to conduct trials fairly and to maintain an atmosphere of impartiality."[39] In asking questions, the judge must "sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury."[40]

In the instant case, the circuit court propounded over 300 questions to witnesses. Counsel for Thomas Memorial objected to the form of many of these questions and asked for a mistrial, objections that were dismissed by the circuit court. We have reviewed the circuit court's questions and find that many implicitly suggested Thomas Memorial's charting requirements were burdensome for employees. The circuit court's questions suggest a jaundiced view of Thomas Memorial's witnesses, while the questions for the plaintiff were friendly, courteous, and favorable to the plaintiff.

---

[38] Syllabus Point 3, *State v. Farmer*, 200 W.Va. 507, 490 S.E.2d 326 (1997).

[39] *McDonald v. Beneficial Standard Life Ins. Co.*, 160 W.Va. 396, 398, 235 S.E.2d 367, 368 (1977).

[40] *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979) (quoting *Frantz v. United States*, 62 F.2d 737, 739 (6th Cir. 1933)). *See also State v. Thompson*, 220 W. Va. 398, 400, 647 S.E.2d 834, 836 (2007) (holding judges in criminal cases must exercise restraint and impartiality in questioning witnesses).

29

Moreover, when counsel for the hospital objected to the circuit court's questioning, the circuit court expressed anger. On one occasion, the circuit court accused defense counsel of "padding the record" and told counsel to discuss his objections "in a humanly way" off the record. On the sixth day of trial, counsel for the hospital made a motion for a mistrial based upon the circuit judge's conduct. The circuit court interrupted counsel, asking, "Are you reading something there?" When counsel said he was referring to his trial notes, his own work product, the circuit court told him to put his notes in the record. Counsel filed his notes under seal.

We have also examined various evidentiary rulings by the circuit court throughout the trial. Specifically, Thomas Memorial offered, at various points throughout the trial, evidence to establish the state of mind of several hospital employees. "Evidence demonstrating the employer's state of mind is 'of crucial importance in wrongful discharge cases.'"[41] Various documents were offered by Thomas Memorial to establish how hospital managers acted toward the plaintiff, and to show what evidence led them to terminate the plaintiff.

The plaintiff objected, asserting that the statements contained within the documents were hearsay. Thomas Memorial rightly countered that any statements contained within the documents were not hearsay because they were not offered for the truth of the matters asserted, but rather were "offered for the mere purpose of explaining

---

[41] *Garner v. Missouri Dep't of Mental Health*, 439 F.3d 958, 960 (8th Cir. 2006) (quoting *Hardie v. Cotter & Co.,* 849 F.2d 1097, 1101 (8th Cir.1988)).

previous conduct."[42]  "Words offered to prove the effect on the hearer are admissible when they are offered to show their effect on one whose conduct is at issue."[43]  Because the documents showed the evidence and statements weighed by the hospital's managers who eventually discharged the plaintiff, and went to the managers' states of mind, they should have been admissible.

Also at trial, the circuit court permitted counsel for the plaintiff to read portions of the same documents during the examination of witnesses.  However, the circuit court prohibited defense counsel from using or admitting the very same documents with the very same witnesses.

In sum, our review of the record shows numerous abuses of the circuit court's questioning of witnesses.  It also shows an abuse of discretion in the admission, or refusal to admit, evidence favorable to the defense.  Taking the record as a whole, we find the jury's entire verdict to be inherently unreliable.  The circuit court's judgment

---

[42] Syllabus Point 1, *State v. Paun,* 109 W.Va. 606, 155 S.E. 656 (1930). *See also* Syllabus Point 1, in part, *State v. Maynard*, 183 W.Va. 1, 393 S.E.2d 221 (1990) ("Generally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: . . . the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent, *state-of-mind*, identification or reasonableness of the party's action[.]) (emphasis added); *State v. Morris*, 227 W.Va. 76, 80-81, 705 S.E.2d 583, 587-88 (2010) ("This Court has held that testimony by police officers involving matters they learned from other persons offered merely to explain prior conduct in carrying out the investigation is not hearsay.");  *State v. Dennis*, 216 W.Va. 331, 350, 607 S.E.2d 437, 456 (2004) (Statement was not hearsay, because "the victim's out-of-court statement was not offered for the truth of the matter asserted, but rather to explain the actions taken by the officer after the statement was made to him.").

[43] 29 Am. Jur. 2d Evidence § 676.

31

regarding the plaintiff's wage claim must therefore be reversed, and the wage claim remanded for a new trial.

## IV.
## CONCLUSION

The circuit court erred when it refused to grant Thomas Memorial judgment as a matter of law on the plaintiff's causes of action for wrongful discharge, intentional infliction of emotional distress, and defamation. The circuit court also erred when it refused to grant the defendant hospital a new trial on the plaintiff's claim for unpaid wages.

Accordingly, the circuit court's June 23, 2015, order is reversed, and the case is remanded for further proceedings on the plaintiff's unpaid wage claims.

Reversed and remanded.